PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Powell and Kelsey, JJ., and Russell, S.J.

WILLIAM H. GORDON ASSOCIATES, INC.

OPINION BY
v. Record No. 150279                                          JUSTICE S. BERNARD GOODWYN
February 12, 2016

HERITAGE FELLOWSHIP, UNITED CHURCH
OF CHRIST, A/K/A HERITAGE FELLOWSHIP
CHURCH

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jane Marum Roush, Judge

In this appeal, we consider when the cause of action for a negligent design claim against an engineer accrues. We also consider whether a construction contract between a contractor and an owner absolves a third-party engineer of liability. Third, we consider the evidence required to establish a breach of the standard of care for a professional engineer. Fourth, we consider whether a co-defendant is entitled to an offset or credit when one defendant settles with the plaintiff for attorneys' fees. Finally, we consider whether extended construction interest payments are an appropriate measure of damages for construction delay when the loan term was not extended or altered by the construction delay.

BACKGROUND

On July 7, 2006, Heritage Fellowship Church (Heritage) entered a contract (Engineering Contract) with William H. Gordon Associates, Inc. (Gordon), an engineering firm, to design "Final Site Plans" for a rain tank system to be installed at a property where Heritage was planning to build a new sanctuary.[1] Per Gordon's plans, the rain tank was to be buried beneath

---

[1] The purpose of the rain tank system here was to provide stormwater management by capturing surface water and providing short-term localized storage of it. The plan called for approximately 3,190 modules arranged in 58 columns and 55 rows.

ten feet of dirt cover and paved over for use as a parking lot. Heritage also engaged Gordon to

provide "Construction Coordination." The Engineering Contract states in relevant part:

## SCOPE OF SERVICES

Final Site Plan: preparation of final construction documents for site development to include provisions for 221,000 square feet building and an approximate 200 space surface parking on an approximately 5.0 acre site with associated driveways, grading and storm sewer, sanitary sewer, water mains and service connections, and erosion and sedimentation control facilities. Construction documents will include:

- Stormwater Management [RainTank] (SWM)/Best Practices (BMP) plans – preparation of detailed SWM/BMP computations and final design drawings for detention and water quality facilities adequate to provide the required water quantity and quality abatement of post-developed conditions. [Task 445]

- Site Plan Revisions [Task 442 B] – given the fact that this site plan is being filed concurrent with the rezoning and special permit, it is inevitable that there will be changes required to the site plan after its first submission. Revisions will be required to the grading plans, horizontal geometry plans, utility plans and erosion and sedimentation control plans or any other plans in the set. This includes changes to the plan in response to county first submission comments.

**Optional Services**

Construction Coordination [Task 454] – provide assistance to the Client and/or Client's representative during construction including review of shop drawings and answering questions, as required.

The Engineering Contract explicitly excluded from Gordon's promised services (1) "Redesign of

the site after the layout has been approved by the client or his designated representative" and (2)

"Redesign of the site after the layout has been approved by the Client or his designated

representative or due to Architect's changes after the site engineering is complete."

Additionally, the Engineering Contract contained a rider of Gordon's "Standard Terms

and Conditions" with the following relevant provisions:

2

3. In performing its services, Gordon shall be entitled to rely on the accuracy and completeness of work and information supplied by third parties, the Client and his authorized representative and the public record.

. . . .

7. Gordon will perform its services using that degree of care and skill ordinarily exercised under similar conditions by reputable members of our profession practicing in the same or similar locality and in compliance with any applicable codes, statutes and/or regulations.

. . . .

10. Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statute of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion.

On December 27, 2006, a Heritage representative signed Gordon's rain tank design plan. On January 2, 2007, Gordon's engineer signed and sealed it, and on January 9, 2007, it was submitted to Fairfax County for approval. Following the County's review, the plan was ultimately approved by the county on August 5, 2009.

The rain tank design plan was provided to Heritage's architect, LeMay Erickson Willcox, on June 9, 2009 for incorporation into the full site plan, and in November 2009, Heritage entered into a contract with general contractor Whitener & Jackson, Inc. (W&J) for the construction of the sanctuary and parking lot (Construction Contract), including the rain tank designed by Gordon.

The Construction Contract provided in relevant part:

§ 3.1.3 The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons or entities other than the Contractor.

3

. . . .

§ 3.12.7 The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples, or similar submittals until the respective submittal has been approved by the Architect.

. . . .

§ 3.12.8 The work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibilities for deviations from requirements of the contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

. . . .

§ 12.2.1 The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work . . . shall be at the Contractor's expense.

Heritage also contracted with Professional Service Industries (PSI), a third-party inspector, to oversee W&J's installation of the rain tank.

On December 15, 2009, Heritage entered into a loan agreement for an $11.5 million, six-percent interest rate construction loan to pay for the construction of the church, including the parking lot and rain tank. The loan had two phases: (1) the "construction term" was 24 months ending on December 15, 2011, during which time monthly payments consisted of interest only; and (2) the "permanent phase" began on January 15, 2012, consisted of monthly payments of principal and interest, and the loan repayment was due in full on the maturity date of December 15, 2014.

4

On October 14, 2010, W&J raised concerns about the suitability of the rain tank for the location, given the high water table, including questions about installation and performance, and submitted a "Request for Information" (RFI) to Gordon for guidance. In response, Gordon did not address the installation issues, and it addressed the performance issues by referring to information in the manufacturer's drawings to assure W&J that their ground water concerns would not impact the functional design of the rain tank; Gordon did not reevaluate the choice of the rain tank system in light of the concerns raised by W&J.

W&J installed the rain tank between April and May 2011. The completed rain tank and the parking lot above it collapsed in August 2011, delaying the scheduled December 5, 2011 occupancy of the church by several months.

Gordon designed and W&J installed a different stormwater management system in January 2012. The Church gained partial occupancy in May 2012, but was unable to use two wings of the church and had to hold additional services each Sunday because the incomplete parking lot could not accommodate the full congregation at the normal service. The parking lot was completed and full occupancy granted in August 2012.

Heritage refused to pay W&J for installing the new stormwater system, and also kept the retainer owed to W&J under the Construction Contract. On January 16, 2013, W&J sued Heritage for payment, and on April 29, 2013, Heritage filed a counterclaim against W&J for breach of contract on the installation work. On August 9, 2013, Heritage filed a third-party claim against Gordon for any repair and replacement costs it was found to owe W&J because of the rain tank collapse (the W&J Case). Heritage also had previously filed a separate suit against Gordon on July 26, 2013 for damages incurred from the rain tank collapse (the Heritage Case).

5

Additionally, Heritage filed a separate action against PSI seeking damages for the collapse and for attorneys' fees it was entitled to from PSI pursuant to their contract. However, Heritage and PSI reached a $200,000 settlement before trial. The settlement agreement allocated the settlement proceeds entirely to attorneys' fees but released PSI from all claims related to the collapse.

The circuit court consolidated the Heritage Case and the W&J Case for a bench trial. Heritage and W&J's experts testified that Gordon breached its standard of care by failing to conduct due diligence regarding the suitability of the rain tank design for the Heritage site, incorporating specifications from non-engineers into its own plans without verifying them, providing ambiguous plans, and failing to respond appropriately to questions during construction. Gordon argued that the Construction Contract shifted liability for the rain tank failure and remediation work to W&J, releasing Heritage and Gordon from responsibility to pay for the remediation work.

W&J offered expert testimony that Gordon's negligent design of the rain tank caused the collapse. Heritage offered expert testimony and documentary evidence that breaches of the standard of care by either or both Gordon and W&J caused the collapse. Gordon's experts testified that the rain tank would not have collapsed but for construction errors by W&J, and that Gordon met its standard of care by relying on information from the rain tank manufacturer.

In its final order, the circuit court found "the sole proximate cause of the collapse of the 'Rain Tank' stormwater management structure in the parking lot . . . was the failure of the civil engineer [Gordon] to meet its standard of care as a Virginia professional engineer in the

6

engineering services it provided [Heritage]." The court also found that "any failures by the general contractor . . . were not material and not a proximate cause of the collapse."[2]

The circuit court entered judgment for W&J on its claims against Heritage in the amount of $893,059.21 for the removal and replacement of the rain tank system, including the $402,425 withheld retainer. The court found that in the W&J case, Heritage was entitled to recover from Gordon the $893,059.21 it owed to W&J, minus the $402,425 retainer, for an award to Heritage of $490,634.21.

In the Heritage Case, the court awarded Heritage an additional $846,647.84 for delay and other damages associated with removing and replacing the rain tank. That award included $569,260.49 in interest payments Heritage made on its construction loan during the delay period as damages incurred by Heritage because of the delayed occupancy of its building. Further, the court found that Gordon was not entitled to an offset in the amount of Heritage's settlement with PSI because "that was a separate contract, separate damages. It was attributed to their legal fees. I see no reason to look behind the contract in terms of that the contribution was for the legal fees, which is a separate injury to Heritage." Gordon filed an appeal in this Court.

Gordon's assignments of error are as follows:

> 1. The trial court erred as a matter of law in awarding judgment in favor of the general contractor against the owner for the cost of removing and replacing work which was not constructed in conformity with the contract documents and contractor's approved submittal, as required by the owner-contractor contract. Consequently, the trial court erred by awarding judgment against the design civil engineer on the owner's third-party claim for the damages erroneously awarded to the general contractor.

---

[2] Before ruling, the court clarified that during the trial, "I gave some comments from the bench of what my thinking was, but that wasn't really a detailed finding in terms of that that was the sole event. . . . What I ruled was Gordon was responsible for the rain tank collapse."

7

2. The trial court erred as a matter of law in awarding any judgment in favor of the owner against the civil engineer where there was no evidence that any breach of the professional standard of care proximately caused any damage to owner.

3. The trial court erred as a matter of law in rejecting the civil engineer's statute of limitations defense to the owner's claims of negligent design where the owner accepted the civil engineer's design more than five years prior to filing suit.

4. The trial court erred as a matter of law in entering a judgment in favor of the owner against the civil engineer notwithstanding, and without crediting, the owner's settlement with the third-party inspector who the owner alleged was a concurrent proximate cause of the Rain Tank system failure.

5. The trial court erred in awarding "extended construction loan interest" damages in favor of the owner against the civil engineer where the claimed "damages" were required by the bank loan terms negotiated by the owner and not proximately caused by the civil engineer's alleged negligence.

ASSIGNMENT OF ERROR 3

We address first Gordon's third assignment of error, as it concerns the threshold matter of whether Heritage's negligent design claim should be barred by the applicable statute of limitations. Gordon argues that the five-year statute of limitations on Heritage's negligent design claim began to run with the signing of the sealed initial rain tank design plan on January 2, 2007 and that it had expired at the time Heritage filed its actions in July and August 2013. Heritage argues that, according to the terms of the Engineering Contract, the limitations period did not begin to run until August 5, 2009, because that is the date on which the engineering plan was approved by the county.[3]

Whether Heritage's negligent design claims against Gordon are barred by the statute of limitations presents a mixed question of law and fact. Our review of a trial court's determination of the correct statute of limitations presents a question of law that we review de novo. Willard v.

---

[3] In the alternative, Heritage notes that its claim based upon Gordon's negligent oversight accrued in October 2010.

8

Moneta Bldg. Supply, 262 Va. 473, 477, 551 S.E.2d 596, 597 (2001). However, we will uphold the trial court's factual findings in accepting or rejecting the defense unless they are plainly wrong or without credible supporting evidence. Floyd S. Pike Electrical Contractor, Inc. v. Commissioner, Dep't of Labor & Industry, 222 Va. 317, 322, 281 S.E.2d 804, 807 (1981). We strictly enforce statutes of limitations unless there is a clear statutory exception or tolling provision. Casey v. Merck & Co., 283 Va. 411, 416, 722 S.E.2d 842, 845 (2012).

An action for the negligence of a design professional is an action for breach of contract and is thus governed by the statute of limitations applicable to contracts. Virginia Military Inst. v. King, 217 Va. 751, 758-59, 232 S.E.2d 895, 899-900 (1977) (VMI). Code § 8.01-246(2) provides that an action for breach of a written contract must be filed within five years after the cause of action accrues. The cause of action for negligent design accrues when the allegedly negligent plans are "finally approved." Id. at 759, 232 S.E.2d at 900.

In VMI, the contract was for design plans – subject to approval by both VMI and the governor – and for supervisory services by the architects during construction of a building. Id. at 754, 232 S.E.2d at 897. The drawings were tendered to VMI on January 2, 1968; the governor granted conditional approval on January 16 and final approval on February 23, 1968. Id. We agreed with the circuit court that the date of final approval by both VMI and the governor – February 23, 1968 – constituted final acceptance and was therefore the date on which the cause of action for negligent design accrued. Id. at 759, 232 S.E.2d at 900.

On January 2, 2007, Gordon's engineer signed and sealed the rain tank design plan which had been previously provided to and signed by Heritage. The plan was submitted to the county on January 9, 2007, and over the next 30 months, various county sub-agencies commented on, required the revision of, and approved different aspects of the site plan. On June 9, 2009,

9

Heritage provided the rain tank plans to its architect for incorporation into the full site plan. The county approved the final plan on August 5, 2009. Following the rain tank failure in August 2011, Heritage and Gordon executed a six-month tolling agreement on June 30, 2012.

The Engineering Contract indicated that county approval was necessary prior to the final completion of Gordon's duties regarding the rain tank plan. The "scope of services" provided in the Engineering Contract required preparation of a final site plan and anticipated and required that Gordon make changes to the plan in response to any comments from the county after the plans were submitted to it. In other words, build-ready plans, not merely preliminary design sketches, were required to complete Gordon's responsibility concerning the design of the rain tank system. The engineering plan could not be final until after it had received approval from the county.

Pursuant to the Stormwater Management paragraph of the Engineering Contract set out above, the January 2007 submission could not fulfill Gordon's design obligations because at that time it would be impossible to know whether the submission provided adequate facilities for "post-development conditions" because the "post-development conditions" would be unknown until the site plan was finalized. Further, the Site Plan Revisions paragraph of the Engineering Contract indicates the parties' intention that the January 2007 plan submission would not be the end of Gordon's design services, as it explicitly provides for revisions in response to county comments.

The Engineering Contract itself called for revisions in response to county comments as part of the design phase. Thus, the "excluded services" reservations would apply to any revisions after county approval on August 9, 2009. Notably, the Site Plan Revisions provision of the Engineering Contract is explicitly within the Final Site Plan portion of the contract. It is

10

wholly distinct from the "optional services" for which the parties also contracted, including "Construction Coordination." Accordingly, the design phase included revisions up until final approval, but did not extend to include Gordon's construction coordination or subsequent remedial work because "when the plans were approved the undertaking to furnish them ceased." See VMI, 217 Va. at 760, 232 S.E.2d at 900. Thus, the terms of the contract demonstrate that the date on which the county approved the final site plan was the date on which Gordon's obligation concerning the engineering design was completed, and Heritage accepted the engineering plans, marking the beginning of the statute of limitations period for the negligent design claim.

The final plans were approved by the county on August 5, 2009, fulfilling Gordon's contractual obligations under the Engineering Contract regarding the plans. That event began the running of the five-year statute of limitations on any negligent design claim based upon those plans.[4] Thus, the circuit court did not err in finding that Heritage's July and August 2013 negligent design actions were filed within the applicable statute of limitations.

ASSIGNMENT OF ERROR 1

In support of its first assignment of error, Gordon contends that the Construction Contract placed liability for any failure and remediation of the rain tank on W&J, and that therefore Heritage had no duty to pay the remediation costs. Thus, Gordon was not liable to reimburse Heritage for those costs. Heritage argues that the Construction Contract did not shift responsibility for design failures and oversight from Gordon to W&J, and that there is evidence to support the circuit court's finding that W&J adhered to Gordon's plans and that it was Gordon's design plans that caused the failure.

---

[4] The six-month tolling agreement extended the period to February 8, 2015.

Whether the Construction Contract shifted liability for the rain tank collapse and remedial work to W&J is an issue of contract interpretation we review de novo. Bailey v. Loudoun Cnty. Sheriff's Office, 288 Va. 159, 169, 762 S.E.2d 763, 766 (2014).

The Construction Contract required W&J to perform in accordance with Gordon's submittals, and be held liable for issues arising from deviations from those submittals. The Engineering Contract did not transfer liability for shortcomings in Gordon's plans to W&J merely by virtue of W&J using the plans in its construction work; nor did it shift responsibility for design work from Gordon to W&J. Rather, the plans and contract left no design discretion to W&J. The contract itself forbade W&J from making any design changes without Gordon's express written consent.

Phillip Sharff, W&J's expert, testified that Gordon's plan was a "prescriptive specification" in which the engineer identifies exactly how many of which materials of which certification the contractor must use.[5] Sharff distinguished such plans from a "performance-type spec" which identifies the general desired outcome but requires the contractor to perform additional design work, stating "[a performance spec] was not the case in this particular contract."

Michael Houlihan, Heritage's expert, agreed that the plans were not performance plans and did not leave design work to W&J. Houlihan added that under industry practice, any delegation of design responsibility requires the new submittal to be developed by an engineer and sealed by an engineer. Thus, the Construction Contract did not shift design liability to W&J for the design of the rain tank plans, it only required W&J to adhere to the plans Gordon signed and sealed.

_____

[5] Sharff's testimony was admissible only in the W&J Case because Heritage did not designate him as an expert upon whom it intended to rely in the Heritage Case.

There was evidence to support the circuit court's finding that W&J substantially complied with Gordon's plans and any deviations therefrom were immaterial and did not contribute to the collapse. Gordon's plans called for a specific rain tank system. W&J was obligated to supply and install this precise system as required by the plans, and there was evidence that it did so.

Sharff testified that W&J obtained the specified system and included the corresponding literature with its submittal as confirmation. He testified further that he had not "seen any evidence that the contractor did anything that would have caused this collapse." W&J's foreman, who oversaw the installation process, testified that W&J complied with Gordon's specifications as to materials required and process proscribed. Finally, an internal PSI email stated that as to W&J's work, "everything has been done in accordance with the plans, specs, manufacturer's recommendations, and we have no outstanding deficiencies." Thus, there was evidence to support the circuit court's conclusion that W&J did not deviate from Gordon's plans and thus trigger the liability asserted by Gordon on the part of W&J.

Because the Construction Contract did not shift design liability to W&J, and there was evidence that W&J adhered to Gordon's plans in all material aspects in installing the rain tank system, W&J was not obligated to pay for the remediation work necessitated by the collapse caused by the negligently designed rain tank system. As such, the circuit court did not err in finding that W&J was entitled to be paid for the removal of the rain tank and installation of the replacement system.

The circuit court did not err in passing the liability for paying W&J on to Gordon, because there was evidence supporting the circuit court's finding that flaws in Gordon's plan caused the rain tank's failure. Causation is a factual issue, so we uphold the circuit court's

13

decision unless plainly wrong or without supporting evidence. Lo v. Burke, 249 Va. 311, 318, 455 S.E.2d 9, 13 (1995).

Sharff testified that Gordon violated its duty by relying solely on the manufacturer's generic literature rather than conducting due diligence with regard to the appropriateness of the product for the Heritage site. He opined that as a result of this failure of diligence, the rain tank was buried too deep, a problem he identified as one of the primary causes of the failure. Houlihan testified that Gordon's plan was not clear, constructible, or very likely to serve its purpose because it did not provide specifications, drawings and a design that was clearly understood by the contractor and other parties involved in the construction. Phillip Reidy, Heritage's causation expert, testified that these "inadequate" and "ambiguous" specifications from Gordon contributed to the collapse.

Kiet Nguyen, W&J's expert for design build and forensic engineering, testified that the rain tank was built according to Gordon's plan, but that the plan itself, given the site location, caused the failure. Specifically, he testified that the tank should not have been "built in" the water table, that Gordon knew about the water table at the site, and that Gordon failed to address the issue. Further, he opined that the fabric and alignment issues regarding W&J's installation suggested by Gordon to be contributory issues would not have caused the "global problem" and system failure that actually occurred, and that the problem lay instead with the entire design.

Therefore, because the Construction Contract did not shift design liability to W&J, and there was evidence to support the circuit court's finding that flaws in Gordon's design, not W&J's execution of them, caused the collapse, the circuit court did not err in holding Heritage liable for W&J's remediation work, and passing that cost through to Gordon.

14

In its second assignment of error, Gordon contends that the circuit court erred in finding it was the sole proximate cause of the collapse, because it did not breach its professional duty in relying on information from the rain tank manufacturer. Further, it maintains that there was evidence that the rain tank would not have collapsed but for W&J's negligent construction. Heritage argues that evidence of Gordon's negligent design and oversight was sufficient to support the finding that Gordon breached the standard of care and such breach proximately caused the rain tank failure.

Breach of duty and causation are factual issues, so we uphold the circuit court's decisions on these issues if they are not plainly wrong or without supporting evidence. Dominguez v. Pruett, 287 Va. 434, 440, 756 S.E.2d 911, 914 (2014); Specialty Hosps. of Wash., LLC v. Rappahannock Goodwill Indus., 283 Va. 348, 354, 722 S.E.2d 557, 559 (2012). "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004). Implicit in every contract of professional employment is the professional's duty to exercise the care of those ordinarily skilled in the business. O'Connell v. Bean, 263 Va. 176, 180-81, 556 S.E.2d 741, 743 (2002).

Here, Gordon contracted to design and oversee the construction of the rain tank system and had to satisfy the professional standard of care in both designing the engineering plans and overseeing the construction. Engineering, like architecture, medicine, and automotive transmission design, is in most instances sufficiently technical to require expert testimony to establish the standard of care and whether there has been any departure from that standard. See

15

Nelson v. Commonwealth, 235 Va. 228, 236, 368 S.E.2d 239, 243-44 (1988) (architecture) (citing Bly v. Rhoads, 216 Va. 645, 650-51, 222 S.E.2d 783, 787 (1976) (medical malpractice); Ford Motor Co. v. Bartholomew, 224 Va. 421, 430, 297 S.E.2d 675, 679 (1982) (automotive transmission design)). This expert testimony must "establish the appropriate professional standard, … establish a deviation from that standard, and … establish that such a deviation was the proximate cause of the claimed damages." Seaward Int'l, Inc. v. Price Waterhouse, 239 Va. 585, 592, 391 S.E.2d 283, 287 (1990).

Regarding the design of the system, Houlihan testified that the standard of care for a Virginia-licensed engineer requires compliance with 18 VAC § 10-20-760, which establishes that:

> no professional shall affix a name, seal or certification to a plat, design, specification or other work constituting the practice of [engineering] which has been prepared by an unlicensed or uncertified person unless such work was performed under the direct control and personal supervision of the professional while said unlicensed or uncertified person was an employee of the same firm as the professional or was under written contract to the same firm that employs the professional.

Houlihan testified further that the standard of care requires engineers to "develop a design that is clear and constructible, and that is very likely to serve its purpose successfully once in operation. And to do that, the engineer must prepare plans, specifications, drawings and a design that is clearly understood by the contractor and all the other parties during construction." Houlihan explained that "[d]esigns that have a high probability of success require investigation of all the elements of the design and identification of those elements that need to be conveyed to the contractor and addressed in design to assure the design will perform as required." This includes investigating both the product and the site, and performing additional due diligence when the proposed project falls outside the scope of the manufacturer's

16

specifications. According to Houlihan, an engineer that adopts the general plans and specifications prepared by the non-engineer manufacturer falls below this standard of care and violates 18 VAC § 10-20-760.

Houlihan testified that Gordon breached the design standard of care in a number of material ways. First, it violated 18 VAC § 10-20-760 when it incorporated the manufacturer's unverified literature into the design which it later sealed. Second, also in violation of 18 VAC § 10-20-760, it apparently failed to fully understand some of the information and recommendations made by other parties, but nonetheless included them in its plan. Third, it failed to adequately consider a significant factor, that the water table at the Heritage site was much higher than the water table at previous rain tank installation sites and outside the manufacturer's specifications. Nguyen concurred, opining that the location of the water table was known and that the rain tank should not have been built into it. Fourth, Houlihan testified that Gordon's plans failed to provide adequate instruction to W&J regarding the necessity of creating a very level base for the rain tank. Therefore, there was evidence to support the circuit court's factual finding that Gordon breached the standard of care for engineering design.

There was evidence that this breach of the design standard of care proximately caused the rain tank failure. Mark Laughlin, W&J's project manager, testified that there was "[a] lot of rock on site that was very challenging in both the construction of the basement and the stormwater management system, and a very high water table that appeared really to become evident once we began the demo process." Nguyen testified that the plan itself, given the site location, caused the failure, primarily due to the high water table, of which Gordon was aware.

Robert Bachus, Heritage's expert, testified that the design was such that if the surface was not perfectly level, the rain tank would fail "from the get-go." However, despite its highly

17

delicate nature, Gordon's plans failed to give tolerances for the flatness of the base or to require the vertical panels to be nearly perfectly perpendicular. Thus, despite the contractor's material compliance with Gordon's design, the system failed. Bachus stated that "[t]he non-verticality of the panels, which I believe to be the primary cause of failure, was contributed [to] by the lack of being level." Reidy testified that the ambiguity in Gordon's plan contributed to the failure. He agreed that "[t]he degree to which the base on which [the rain tank] is constructed is level is critical" and "a lack of uniformity of the subbase on which the rain tank was constructed at Heritage is the cause of the collapse." Therefore, there was evidence sufficient to support the factual finding that Gordon's negligent design proximately caused the rain tank collapse.

Second, regarding oversight, Houlihan testified that the standard of care for construction oversight requires an engineer to provide quality oversight during construction to ensure that certain elements of the plans are properly specified and verified in the field. Further, he stated that the standard of care requires an engineer to reexamine its original plan when the contractor submits an RFI about the suitability and performance of a structure.

Houlihan testified that Gordon breached this standard of care by failing to respond at all to suitability concerns raised in the RFI and relying on information from standard manufacturing literature to respond to performance concerns, rather than conducting its own review of the product and the situation at the site. Accordingly, Gordon's responses would appear to have violated Gordon's duty to provide oversight assistance to W&J, in a manner consistent with the industry's standard of care and skill.

There was evidence in the record that the oversight breach proximately caused the rain tank failure. Nguyen testified that the failure could have been prevented if Gordon had addressed the issue of the high water table when W&J began construction. He also stated that

18

the lack of on-site assurance – which Houlihan indicated was part of Gordon's responsibility – contributed to the collapse. Finally, the fact that Gordon's reassessment of the site after the collapse resulted in its decision to install a different system better suited to the Heritage site is indicative that had Gordon reassessed the plan in response to W&J's RFI, the change would have been made at that time, avoiding the collapse.

In summary, there was evidence that Gordon breached the standard of care required of a professional engineer regarding the design and construction oversight of the rain tank system, and that these breaches proximately caused the collapse. Accordingly, the circuit court's finding that "the sole proximate cause of the damages was the failure of Gordon to meet the minimum standard of care as an engineer required of it by its contract with the Church" must be upheld.

ASSIGNMENT OF ERROR 4

In its fourth assignment of error, Gordon contends that under common law, the $200,000 settlement agreement between Heritage and PSI operated as a complete release of Heritage's claim against Gordon because it involved the same injury – the failed rain tank. In the alternative, Gordon claims that even if the settlement did not entirely release Gordon, it is entitled to an offset for the settlement under Code § 8.01-35.1. Heritage argues that because the settlement was apportioned entirely to attorneys' fees that Heritage was not entitled to recover from Gordon, the settlement effected no release or offset.

Whether PSI's settlement payment to Heritage released Gordon from liability or effected an offset presents a mixed question of law and fact. See Smyth Cnty. Cmty. Hosp. v. Town of Marion, 259 Va. 328, 336, 527 S.E.2d 401, 405 (2000) (indicating that the application of a statutory requirement "is a mixed question of fact and law"). Therefore, we defer to the circuit

19

court's factual findings and review de novo its application of the law to those facts. PS Bus.

Parks, L.P. v. Deutsch & Gilden, Inc., 287 Va. 410, 417, 758 S.E.2d 508, 511 (2014).

Code § 8.01-35.1 provides in relevant part:

A. When a release or a covenant not to sue is given in good faith to one of two or more persons liable for the same injury to a person or property, or the same wrongful death:

1. It shall not discharge any other person from liability for the injury, property damage or wrongful death unless its terms so provide; but any amount recovered against the other person or any one of them shall be reduced by any amount stipulated by the covenant or the release, or in the amount of the consideration paid for it, whichever is the greater.

This section addresses release and liability regarding both tangible and intangible property rights, and is not limited to tort actions. See Black's Law Dictionary 1410 (10th ed. 2014) (defining "property" as "the rights in a valued resource such as land, chattel, or an intangible."); 2007 Va. Acts ch. 443 (replacing all references to "tort" with "injury," and all references to "tortfeasor" with "person"). A party who wishes to obtain credit for a plaintiff's prior receipt of payment for the same injury from another co-defendant is required to make a motion, and bears the burden on that motion. See Acordia of Virginia Ins. Agency v. Genito Glenn, L.P., 263 Va. 377, 389, 560 S.E.2d 246, 252-53 (2002). The circuit court must make its determination after any jury verdict.

Here, Heritage filed suit against Gordon for the damages it sustained when the rain tank collapsed and also sued PSI, seeking damages related to the rain tank collapse, as well as attorneys' fees. Attorneys' fees were recoverable by Heritage from PSI because of the terms of their contract. Thus, attorneys' fees were only claimed in Heritage's complaint against PSI and not in its complaint against Gordon.

Prior to trial, Heritage and PSI reached a settlement agreement. Pursuant to the terms of the agreement, Heritage released PSI from all claims related to the rain tank collapse in return for

20

a payment of $200,000 for attorneys' fees. The circuit court ruled that attorneys' fees paid by PSI were for a "separate contract" and "a separate injury" and that therefore Gordon was not entitled to an offset based upon the PSI-Heritage settlement.

The key "factor to be considered in determining the applicability of the statutory provision [Code § 8.01-35.1] is whether the release or covenant not to sue given . . . was for the 'same injury or the same property damage' as that represented by the jury award [and] we agree that such inquiry is required by the terms of Code § 8.01-35.1(A)." Acordia, 263 Va. at 388, 560 S.E.2d at 252 (emphasis added). While the lawsuits against Gordon and PSI were based on breaches of two different contracts, they were for the same injury within the meaning of Code § 8.01-35.1 because the cause of action in both cases concerned damages resulting from the rain tank collapse. See Cox v. Geary, 271 Va. 141, 151, 624 S.E.2d 16, 22 (2006) (holding the defendant's wrongful incarceration was a single indivisible injury caused by both the Commonwealth and the defense attorney, notwithstanding the fact that the two forms of relief he sought from the respective parties were different, where the defendant did not make "any differentiation between the damages under [his claim against the Commonwealth] and the damages under his legal malpractice claim").[6] The settlement agreement released PSI not only from all liability for attorneys' fees, but also for all liability for damages related to the rain tank collapse. Pursuant to Code § 8.01-35.1, release of PSI from liability regarding damages from the

_____

[6] We note that Cox was decided before the 2007 amendments to Code § 8.01-35.1 expanded its applicability beyond tort actions. 2007 Acts ch. 443. Thus, the ruling in Cox that "the protection afforded by Code § 8.01-35.1 [is] unavailable" because the "[a]ttorneys and the Commonwealth are not joint tortfeasors" has been abrogated by the removal of language in the statute limiting its application to situations where "two or more persons [are] liable in tort for the same injury," on which Cox turned, 271 Va. at 153-54, 624 S.E.2d at 23, and replacement with the current language providing that Code § 8.01-35.1 now applies to "persons liable for the same injury to a person or property." See Shevlin Smith v. McLaughlin, 289 Va. 241, 255 n.3, 769 S.E.2d 7, 14 n.3 (2015). However, this does not change the applicability of the injury analysis.

21

rain tank collapse did not release Gordon from liability for that injury, but it did potentially entitle Gordon to an offset for any amount paid to Heritage to settle that claim.

In ruling on Gordon's request for offset, the circuit court not only stated that the settlement concerned a "separate contract" and "separate damages," but also that the court could "see no reason to look behind the [settlement] contract in terms of that the contribution was for the legal fees." The circuit court failed to note that the settlement agreement released PSI not only from its individual liability for attorneys' fees, but also from liability for rain tank collapse damages that Gordon was found liable to pay Heritage. Pursuant to the stated terms of the settlement agreement, in essence, Heritage and PSI settled the matter of attorneys' fees for $200,000, and the matter of the liability for the rain tank collapse for $0.00. The circuit court erred when it failed to consider whether the recitation in the PSI settlement agreement was accurate regarding this allocation between the two claims of the consideration paid.

In Tazewell Oil Co. v. United Virginia Bank/Crestar Bank, 243 Va. 94, 115, 413 S.E.2d 611, 622-23 (1992), our Court stated:

> In applying this provision of Code § 8.01-35.1, the circuit court must identify the amount of consideration paid by a tortfeasor for a release. In determining this amount, the court must look at the injury or damage covered by the release and, if more than a single injury, allocate, if possible, the appropriate amount of compensation for each injury. The releases in this case involved multiple claims and multiple parties who are closely associated. Nevertheless, the record does not reveal any attempt by the circuit court to ascertain whether the amounts paid were based on the single injury of destruction of Tazewell, or whether some of the consideration covered releases for a different injury or injuries suffered by Tazewell, or suffered by other parties. Without such evidence or analysis, the circuit court could not determine whether the amount stipulated in the release to be credited against recovery was more or less than the amount actually paid in consideration of the release for the conspiracy claims. Consequently, we will remand the case for proceedings necessary to make the determinations required by Code § 8.01-35.1.

22

Code § 8.01-35.1 expressly indicates that there can be a difference between what is "stipulated" on the face of a settlement agreement and the amount of consideration actually attributable to a particular category of exposure. It states that "any amount recovered against the other person or any one of them shall be reduced by <u>any amount stipulated by the covenant or release, or the consideration paid for it</u>, whichever is the greater." Code § 8.01-35.1(A)(1) (emphasis added). See <u>Acordia</u>, 263 Va. at 389-90, 560 S.E.2d at 252-53. The amount of consideration paid for a settlement is a matter for the trial court to consider in applying Code § 8.01-35.1. <u>Id.</u>

In this instance, PSI was released from liability for the payment of attorneys' fees and released from liability for damages resulting from the collapse of the rain tank system upon payment of $200,000. When Gordon, a co-defendant regarding one of the claims released by the settlement agreement, requested an offset, the court was required to ascertain and allocate the appropriate amount of compensation paid for each injury released pursuant to the terms of the settlement, rather than assume that the recital of the parties to the agreement concerning the amount of consideration actually attributable to particular categories of exposure was accurate. We will therefore remand this matter to the circuit court for it to make a determination concerning any amount of offset that Gordon may be entitled to receive based upon the settlement agreement between PSI and Heritage which released the claims against PSI for the rain tank collapse. See <u>Tazewell Oil</u>, 243 Va. at 115, 413 S.E.2d at 623; <u>Acordia</u>, 263 Va. at 389, 560 S.E.2d at 353.

### ASSIGNMENT OF ERROR 5

In its fifth assignment of error, Gordon contends that Heritage was not entitled to $569,260.49 in extended construction loan interest awarded by the circuit court as delay

23

damages, because Heritage's loan term was not extended as a result of the delay in occupancy of its building. Heritage argues that the fact that the loan was not extended "misses the point," and that Roanoke Hospital Ass'n v. Doyle & Russell, Inc., 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975), established construction loan interest paid during a delay as an acceptable measure of delay damages.

Whether Heritage was entitled to extended construction loan interest as damages for the delayed occupancy is a question of law we review de novo. See Shevlin Smith, 289 Va. 241, 264, 267, 769 S.E.2d 7, 19, 21 (2015) (holding that the types of injuries for which damages are recoverable is a question of law reviewed de novo); Sanford v. Ware, 191 Va. 43, 47-51, 60 S.E.2d 10, 12-14 (1950) (providing a de novo analysis of whether non-pecuniary damages were recoverable in a particular tort claim).

There are two broad categories of contract damages: direct (or general) damages and consequential (or special) damages. Washington & Old Dominion Ry. Co. v. Westinghouse Elec. & Mfg. Co., 120 Va. 620, 627, 89 S.E. 131, 133 (1917). We have explained that

> [d]irect damages are those which arise "naturally" or "ordinarily" from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach. Consequential damages are those which arise from the intervention of "special circumstances" not ordinarily predictable. If damages are determined to be direct, they are compensable. If damages are determined to be consequential, they are compensable only if it is determined that the special circumstances were within the "contemplation" of both contracting parties.

Roanoke Hospital, 215 Va. at 801, 214 S.E.2d at 160.

Large construction projects often require third-party financing, and delay ordinarily requires an extension of that financing. Id. at 802, 214 S.E.2d at 160-61. The "added interest costs (including expenditures on borrowed funds and interest revenue lost on invested funds) during the construction period arising from the longer term of borrowing necessitated by the

24

defendant's breach" are "extended financing costs." Id., 214 S.E.2d at 160. These costs are compensable direct damages because they are predictable results of a delay. Id. at 802-03, 214 S.E.2d at 160-61. The measure of damages for these extended financing costs "is either the rental value of the completed structure for the period of delay, or the reasonable return on the completed structure treated as an investment for the period of delay." Id. at 802 n.6, 214 S.E.2d at 161 n.6.

In Roanoke Hospital, the contract at issue required that construction be completed by a specific date. The contract specified that "the building must be completed by the date specified in the contract or else our financial arrangements would have to be redone or rearranged and would cost . . . the hospital a higher rate of interest." Id. at 797-98, 214 S.E.2d at 157. The building was not completed by the date required in the contract and the hospital was forced to assume additional loans and at a higher interest rate. Id. The hospital sued for breach of contract. The damages sought by the hospital only involved interest and costs. The Court noted that "[o]rdinarily, delay in completion requires an extension of the term of construction financing. The interest costs incurred and the revenue lost during such an extended term are predictable results of the delay and are, therefore, compensable direct damages." Id. at 802, 214 S.E.2d at 161. Then, in a footnote, the Court noted that the hospital sought to measure the extended financing damages by a reasonable return on investment, and this Court approved of the jury's decision to apply the construction loan rate to the loan receipts rather than applying an arbitrary interest rate to calculate that value. Id. at 802 n.6, 214 S.E.2d at 161 n.6. Heritage cites Roanoke Hospital as support for the circuit court's award of the interest paid on loans during the delay in occupancy as proper damages in this instance. We disagree.

25

Here, unlike in <u>Roanoke Hospital</u>, while the rain tank collapse delayed occupancy, it did not result in "a longer term of borrowing" for which Heritage deserves compensation. <u>Id.</u> at 802, 214 S.E.2d at 160-61. Under the December 15, 2009 loan agreement, Heritage agreed to a six-percent fixed interest loan with a maturity date of December 15, 2014. The delay period was December 2011 to August 2012. Because the construction loan was to continue out until December 2014, the delay did not require Heritage to amend that financing or obtain new financing. Heritage adhered to the two-phase loan terms during the delay, its financial obligations regarding the loan were not impacted, and it did not allege that it had planned to pay the loan off sooner than the maturity date.

While Heritage may have incurred damages due to delayed occupancy, in this instance "such damages" neither included nor bore any relation to the construction interest payments because such payments were not incurred because of the delay – they were payments Heritage was obligated to make even if no delay had occurred. The circuit court erred in awarding damages for delayed occupancy measured in such a manner.

CONCLUSION

For the reasons stated, we affirm the judgment of the circuit court finding Heritage's claims timely and Gordon liable on Heritage's breach of contract claims. However, we reverse the circuit court's judgment granting Heritage damages in the form of construction loan interest which was not incurred as a result of the breach of contract and order that the amount of those damages, $569,260.49, be deducted from the judgment awarded by the circuit court. Additionally, we remand this matter to the circuit court for it to make a determination concerning

26

any amount of offset that Gordon may be entitled to receive based upon the settlement agreement between PSI and Heritage which released the claims against PSI for the rain tank collapse.

Affirmed in part,
reversed in part,
and remanded.
