PRESENT:  All the Justices

CGI FEDERAL INC.

OPINION BY
v.  Record No. 170617          JUSTICE ELIZABETH A. McCLANAHAN
June 7, 2018

FCi FEDERAL, INC.


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Michael F. Devine, Judge


This appeal involves claims for fraudulent inducement, breach of contract, and unjust

enrichment related to a teaming agreement entered between FCi Federal, Inc. ("FCi") and CGI

Federal Inc. ("CGI") to obtain a federal government contract.  The jury awarded CGI

approximately $12 million in damages for the fraudulent inducement and breach of contract

claims.  After determining that the teaming agreement did not obligate FCi to extend a

subcontract to CGI and that CGI did not prove fraud damages, the circuit court set aside the

jury's verdict.  The circuit court then granted FCi's motion for summary judgment on CGI's

alternative claim for unjust enrichment.  On appeal, CGI contends the circuit court erred in

setting aside the verdict and entering summary judgment for FCi on the unjust enrichment claim.

Concluding there is no reversible error in the judgment of the circuit court, we affirm.

I.  Facts & Proceedings

When a circuit court grants a motion to set aside a verdict, we grant the party for whom

the jury found the "benefit of all reasonable inferences that may be drawn from the evidence and

of all substantial conflicts in the evidence."  *Stover v. Norfolk & Western Ry. Co.*, 249 Va. 192,

194, 455 S.E.2d 238, 239-40 (1995).  We recite the facts in accord with these principles.

1

A.  The Original Teaming Agreement

In 2012, the United States Department of State solicited bids for a visa processing contract ("visa contract" or "prime contract").  CGI, as a large contractor, was ineligible to bid because the State Department reserved the visa contract for small businesses.  Although FCi, as a smaller contractor, was eligible to bid for the visa contract, it did not have the capabilities to perform the work alone.  Unable to compete for the visa contract individually, FCi and CGI agreed to cooperate in submitting a proposal for the visa contract.  To that end, the parties entered a teaming agreement on September 19, 2012 to prepare a proposal for the visa contract.  The teaming agreement set forth FCi's and CGI's rights and obligations in preparing the proposal.

Under the teaming agreement, FCi was required to submit a proposal as the prime contractor and include CGI as a subcontractor.  By entering the teaming agreement with FCi, CGI was prohibited from assisting any other parties competing for the visa contract.  CGI committed to furnish "personnel, information, and materials as necessary" and "to assist FCi . . . in developing and preparing sections of the prime proposal."  CGI also promised to provide "cooperation as may reasonably be deemed necessary or desirable by FCi . . .  to ensure the success of the" visa contract proposal.  Under Section 2.0 of the teaming agreement, FCi "retain[ed] express and exclusive control over all prime proposal activities . . . as well as negotiation of any resulting prime contract."

From the outset, CGI determined it wanted at least 40% of the work available under the visa contract ("workshare") or its participation in the teaming agreement would not be worthwhile.  Accordingly, the parties negotiated a "Statement of Work," labeled as Exhibit A of the teaming agreement, which provided, "Subject to the final solicitation requirements, [CGI]

2

will receive forty-five percent (45%) work share of the total contract value . . . but the work share commitment may not be exactly 45% each year."

If the proposal resulted in a contract award to FCi, the teaming agreement provided a framework for the parties to negotiate a subcontract. For example, Section 3.1 of the teaming agreement required the parties to "enter good faith negotiations for a subcontract . . . subject to applicable laws, regulations, terms of the prime contract and . . . [CGI's] best and final proposal to FCi." Section 3.2 of that agreement, in turn, reiterated the "contemplated subcontract" was subject to numerous conditions including: (1) an award of the prime contract to FCi; (2) the government's approval of CGI as a subcontractor; (3) inclusion in the prime contract of CGI's statement of work and; (4) "[m]utual agreement of the parties . . . to the statement of work, financial terms, and reasonable subcontract provisions."

Continuing, Section 5.1(8) provided that the teaming agreement would expire 90 days after an award of the visa contract to FCi, if the parties could not agree on the terms and conditions of a subcontract. In Section 2.7, the parties acknowledged they would bear their "own respective costs, expenses, risks and liabilities arising out of performance" of the teaming agreement. Section 8.3 stated there was no basis "for the sharing of the profits or losses arising out of the efforts of either or both of the parties," and section 9.0 precluded the recovery of lost profits for a breach of the agreement.

B. The Amended Teaming Agreement

After three months of work with CGI, on December 6, 2012, FCi submitted a proposal to the State Department. FCi, however, did not provide CGI a copy of the proposal and, at the time of submission, FCi did not inform CGI the proposal allocated a 38% workshare to CGI. On March 8, 2013, the State Department notified FCi the proposal was competitive, but directed FCi

3

to address certain deficiencies and submit a revised proposal by April 18, 2013. Based on the State Department's response, FCi informed CGI its workshare would have to be reduced in a revised proposal because the government required additional work to be provided to other subcontractors. Accordingly, CGI's workshare as a subcontractor could not exceed 41% because FCi, as the prime contractor, was required to have 51% workshare for the prime contract.

CGI agreed to accept a 41% workshare for its continued participation in the revised proposal. To offset this workshare reduction, CGI requested that FCi allocate ten management positions for CGI employees working on the visa contract. FCi recognized that CGI's continued involvement was critical for the success of the proposal. In responding to CGI's request, on April 17, 2013, FCi's President, Scott Miller, emailed CGI's Senior Vice-President, Toni Townes-Whitley, assuring her "that our revised teaming agreement with CGI affirms our commitment to CGI providing 10 management/supervisory positions . . . . In addition, the agreement will reflect CGI's 41% total contract value work share." Based on these representations, CGI continued to cooperate with the revised proposal and executed an amended teaming agreement, with an April 17, 2013 effective date. Except for the provision concerning CGI's 41% workshare and the ten management positions designated for CGI, if FCi were awarded the prime contract ("post-award provisions"), the amended teaming agreement did not alter the parties' original teaming agreement.

One day after Miller's email to Townes-Whitley, FCi submitted a revised proposal to the State Department. Contrary to Miller's representations in his email to Townes-Whitley, the revised proposal allocated only a 35% workshare to CGI and reserved all management positions for FCi.

4

### C. Post-Award Negotiations

On August 2, 2013, the State Department awarded FCi the visa contract, but a competing bidder, Ikun, filed multiple protests with the government because it contended FCi was ineligible to bid as a small business. In the subsequent months, FCi and Ikun negotiated a settlement to avoid further challenges to the award. In part, FCi agreed to give Ikun and its affiliates work under the visa contract. Because of the settlement, the workshare FCi was willing to offer to CGI was reduced further. After the bid protests were resolved, the State Department requested FCi submit another revised proposal. Without CGI's knowledge, this second revised proposal provided CGI with an 18% workshare and FCi with a 75% workshare.

On March 31, 2014, the State Department finalized the visa contract, offering FCi a base-year contract with four annual renewal options for a total value of $145 million. Following the contract award, FCi and CGI started negotiations for a subcontract. Initially, FCi offered CGI a 16% workshare and increased the offer to 22%. On June 20, 2014, as negotiations for a final subcontract continued, the parties entered a temporary agreement to allow CGI to begin working on the visa contract. CGI was paid more than $2 million for the work it performed under this temporary agreement. CGI worked on the visa contract until November 10, 2014, at which point FCi terminated CGI for cause because of a staffing dispute.

### D. Trial Court Proceedings

On March 25, 2015, CGI filed suit against FCi. In an amended complaint, CGI asserted three claims. In Count I, based on the post-award provisions of the amended teaming agreement, CGI asserted a claim for breach of contract because FCi failed to extend a subcontract with a 41% workshare and ten management positions to CGI. CGI alleged it would have received $59 million in revenue from its work on the visa contract.

5

In Count II, as an alternative to the breach of contract claim, CGI asserted a claim for unjust enrichment. CGI asserted it spent $300,000 assisting FCi on the visa contract proposal, and alleged FCi would obtain a $6 million profit by performing work it promised to CGI. In Count III, based on the representations FCi made to persuade CGI to enter the amended teaming agreement and to continue to assist with the contract proposal, FCi asserted a claim for fraudulent inducement. For this claim, CGI sought neither rescission of the amended teaming agreement nor damages for the costs it incurred in performing the agreement. Instead, CGI sought $15.1 million in lost profits it expected to earn from the subcontract and $350,000 in punitive damages.

Prior to trial, the circuit court severed the unjust enrichment claim for later resolution, and the claims for breach of contract and fraudulent inducement were tried before a jury. At trial, CGI presented evidence regarding "the major investment" it made in the visa contract proposal and the material assistance it provided to FCi. CGI also presented evidence the State Department viewed FCi's use of CGI as a subcontractor as a strength for the proposal.

CGI's damages expert, Mark Bingham, testified CGI incurred approximately $5.1 million in damages from FCi's breach of the amended teaming agreement and incurred $13.7 million in damages for FCi's fraudulent inducement. By the time of trial, FCi had performed the base year and the first option year of the visa contract, but CGI sought damages for the remaining three option years the State Department had not yet exercised. For the breach of contract claim, CGI also sought $5.1 million in damages for overhead expenses ("indirect costs") it would have incurred over the visa contract's five-year term. CGI did not seek lost profits for its breach of contract claim because Section 9.0 precluded such damages.

For the fraudulent inducement claim, CGI offered proof of two components of damages: (a) indirect costs of $5.1 million and (b) lost profits of approximately $8.5 million. CGI acknowledged the indirect costs were duplicative of its contract damages and could not be recovered for both claims. At the close of all the evidence, FCi moved to strike, arguing among other things, the post-award provisions of the amended teaming agreement were unenforceable and CGI failed to prove any fraud damages. During argument regarding the motion to strike, the circuit court raised whether the 90-day termination provision set forth in Section 5 of the amended teaming agreement limited FCi's damages. The circuit court took the motion to strike under advisement and submitted the case to the jury. The jury returned a verdict for CGI in the amount of $11,998,000. For the breach of contract claim, the jury awarded CGI indirect costs for each year of the contract's term, totaling $3,465,000. For the fraudulent inducement claim, the jury also awarded CGI lost profits for each year of the contract, totaling $8,533,000.

### E. Post-Trial Arguments

Following the verdict, the circuit court directed the parties to submit post-trial briefs on the issues FCi raised in the motion to strike, including the enforceability of the teaming agreements and the recoverability of damages for fraudulent inducement. After holding a hearing on the matters briefed by the parties, the circuit court issued an eighteen-page letter opinion granting FCi's motion to set aside the jury verdict. For Count I, the circuit court ruled the amended teaming agreement was unenforceable because CGI and FCi did not intend to be bound by the agreement's post-award provisions on CGI's workshare and management positions until a formal subcontract was negotiated and signed. Thus, language regarding these terms was "aspirational only" and could not be enforced as a matter of law.

7

For Count III, the court did not overturn the jury's finding that FCi fraudulently induced CGI to enter into the amended teaming agreement. The circuit court, however, vacated the jury's award of lost profits to CGI because the parties had not agreed to a subcontract within 90 days of the visa contract award to FCi, terminating the agreement. Accordingly, CGI could not recover lost profits beyond this period, and, because CGI proved lost profits on an annual basis for the contract's five-year term, there was no basis to award any damages for Count III.

As to Count II, claim for unjust enrichment severed from the trial, FCi moved for summary judgment because of the parties' written contracts. On February 8, 2017, the circuit court entered an order granting summary judgment for FCi on the unjust enrichment claim and incorporated the letter opinion into the order, thereby entering final judgment for FCi on all claims. CGI appeals each of these rulings.

## II. Analysis

### A. Breach of the Amended Teaming Agreement

CGI argues the circuit court erred in overturning the jury's verdict on the breach of contract claim. We disagree because the amended teaming agreement did not create any enforceable obligation for FCi to extend a subcontract with a 41% workshare and ten management positions to CGI.

Whether a contractual provision creates a legally enforceable obligation is a question of law we review de novo. *See Pierce v. Plogger*, 223 Va. 116, 120, 286 S.E.2d 207, 210 (1982). In Virginia, it is well-settled that contractual provisions that "merely set out agreements to negotiate future subcontracts" are unenforceable. *Navar, Inc. v. Fed. Bus. Couns.*, 291 Va. 338, 347, 784 S.E.2d 296, 300 (2016). Such provisions are "too vague and indefinite" to be

8

enforceable. *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514, 519-20, 493 S.E.2d 512, 515 (1997).

CGI argues the post-award provisions of the amended teaming agreement are sufficiently definite to be enforced because the provisions contain reasonably certain terms on the work FCi promised to CGI as a subcontractor and the provisions demonstrate the parties intended for CGI to be the actual subcontractor hired by FCi. When the parties' agreement is read as a whole, these provisions do not create any enforceable post-award obligations for FCi to extend work to CGI as a subcontractor.

Although the amended teaming agreement contains a "Statement of Work" detailing CGI's post-award workshare, this provision also states such work is "subject to the final solicitation requirements" of the visa contract. If FCi were awarded the prime contract, Section 3.1 of the amended teaming agreement required the parties to enter "good faith negotiations for a subcontract . . . subject to applicable laws, regulations, terms of the prime contract and . . . [CGI's] best and final proposal to FCi." Section 3.2 of that agreement also reiterated the need for negotiation of a subcontract and set forth multiple contingencies for any subcontract. Further, under Section 5.1(8) of the amended teaming agreement, if within 90 days of a prime contract award, the parties failed "to reach agreement on the terms and conditions of a subcontract," the agreement terminated. Thus, the parties contemplated a subcontract may not materialize after the prime contract award to FCi and created a mechanism for ending their relationship.

Taken together, these provisions make clear the parties never agreed to the final terms of a subcontract and expressly conditioned the formation of a subcontract on future events and negotiations, including CGI's "best and final proposal" to FCi for a subcontract. At most, the

9

amended teaming agreement imposed a framework for good faith negotiations of a final

subcontract. *See Navar*, 291 Va. at 347, 784 S.E.2d at 300.[1]

Thus, just as FCi could not have relied on this agreement to require CGI to perform work

as subcontractor, CGI could not rely on the agreement to obtain work from FCi as a

subcontractor. Well-established precedent compels us not to impose a subcontract on parties to a

teaming agreement when they have expressly agreed to negotiate the material terms of a

subcontract in the future. As the Court explained more than a century ago,

> [W]e must take the contract as it is. We cannot, by judicial construction, in
> violation of the settled rules on the subject, make a contract for the parties which
> they have not made for themselves; and, as the contract they did make is, by
> itself, intelligible and certain, when its words are taken in their common or
> natural sense, the meaning of those words must be taken as the meaning of the
> parties.

*Holston Salt & Plaster Co. v. Campbell*, 89 Va. 396, 399, 16 S.E. 274, 275 (1892).

### B. Fraudulent Inducement

Concluding that there is no error in the circuit court's ruling on the enforceability of the

amended teaming agreement's post-award provisions, we now address CGI's fraudulent

inducement claim. FCi has not appealed the jury's liability finding on the fraudulent inducement

claim,[2] and thus, we address only the proper measure of damages for this claim and whether CGI

proved any recoverable fraud damages at trial.

---

[1]At trial, CGI acknowledged it was not attempting to establish that FCi breached the amended teaming agreement by failing to undertake good faith negotiations for a subcontract after FCi was awarded the visa contract. Instead, CGI premised its breach of contract claim on FCi's failure to provide a 41% workshare and ten management positions.

[2] Having failed to challenge either the jury's finding it was liable to CGI for fraudulent inducement or the circuit court's failure to set aside this finding of liability, under the law of the case doctrine, FCi has waived the right to subsequently challenge the issue of liability. *See Miller-Jenkins v. Miller-Jenkins*, 276 Va. 19, 26, 661 S.E.2d 822, 826 (2008).

In vacating the jury's damages award, the circuit court ruled CGI's fraud damages were limited by the 90-day termination provision in Section 5 of the amended teaming agreement. Because CGI proved lost profits on an annual basis only, the circuit court determined CGI failed to quantify its damages for this 90-day period. CGI's argues the circuit court erred by applying a contractual provision to limit its recovery of lost profits because a party who fraudulently induces a contract cannot use the terms of the contract to limit tort liability. We do not need to reach CGI's argument on this point because we conclude that lost profits are not recoverable for a fraudulent inducement claim when they are premised on the unenforceable provisions of a contract.

The measure of damages available for a cause of action is a question of law subject to de novo review. *See William H. Gordon Assocs. v. Heritage Fellowship*, 291 Va. 122, 150, 784 S.E.2d 265, 278 (2016). "Damages that are contingent, speculative, and uncertain are not recoverable because they cannot be established with reasonable certainty." *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009). When a defrauded party seeks compensatory damages in the form of lost profits, he or she must prove those damages with reasonable certainty. *See Murray v. Hadid*, 238 Va. 722, 731, 385 S.E.2d 898, 904 (1989) (addressing damages from a lost business opportunity resulting from fraud). "There may be no recovery for loss of future profits when it is uncertain that there would have been any profits at all." *Hop-In Food Stores v. Serv-N-Save*, 247 Va. 187, 193, 440 S.E.2d 606, 609 (1994).

CGI's damages for fraudulent inducement are premised on the post-award provisions of the amended teaming agreement. At trial, CGI sought lost profits because FCi procured the amended teaming agreement by promising a 41% workshare and ten management positions to CGI under the agreement. Relying on a future subcontract with these terms, CGI proved it

11

would have earned more than $8.5 million in profits. However, as we explained, the post-award provisions did not create an enforceable obligation for FCi to extend a subcontract to CGI with these terms. The parties expressly conditioned a subcontract on several contingencies and their negotiations. The final terms of the subcontract, including CGI's workshare, were uncertain, and, consequently, any award of lost profits was uncertain. CGI was induced to enter an agreement to negotiate a future subcontract and the amount of any future profits could not be quantified. Accordingly, we conclude lost profits are not recoverable for a fraudulent inducement claim when they are based on the provisions of an unenforceable contract. *See Goldstein v. Miles*, 859 A.2d 313, 327-31 (Md. Ct. Spec. App. 2004) (determining for a fraudulent inducement claim that a party may not recover benefit-of-bargain damages in the form of lost profits if there is an unenforceable contract).

CGI argues the terms of the amended teaming agreement cannot be used to limit recovery of fraud damages. We have recognized that a party making fraudulent representations cannot rely on the terms of a contract procured by fraud to defeat recovery in tort. *See Horner v. Ahern*, 207 Va. 860, 867-68, 153 S.E.2d 216, 221 (1967); *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 564, 95 S.E.2d 207, 212 (1956). However, this principle is inapplicable to CGI's claim. CGI's recovery of lost profits is not limited by the terms of the amended teaming agreement, but by the parties' failure to include terms in the amended teaming agreement by which lost profits could be reasonably measured. Stated simply, CGI cannot recover profits based on a bargain for a subcontract it never struck. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs., Inc*., 960 S.W.2d 41, 49-50 (Tex. 1998) (determining that in fraudulent inducement claims, lost profits cannot be "based on an entirely hypothetical, speculative bargain that was never struck and would not have been consummated").

12

Accordingly, because CGI cannot recover any lost profits on its fraudulent inducement claim and did not establish any other damages for this claim, the circuit court was correct, albeit for the wrong reason, in vacating the jury's award of damages for this claim.

## C. Unjust Enrichment

We now turn to CGI's alternative claim for unjust enrichment on which the circuit court entered summary judgment in FCi's favor. Unjust enrichment is an implied contract action based upon the principle that "one person . . . may not enrich himself unjustly at the expense of another." *Rinehart v. Pirkey*, 126 Va. 346, 351, 101 S.E. 353, 354 (1919) (internal quotation marks and citation omitted). The existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment. *Southern Biscuit Co. v. Lloyd*, 174 Va. 299, 311, 6 S.E.2d 601, 606 (1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter."). Where an express contract exists between the parties, the question of whether the contract bars an unjust enrichment claim is one of law we review de novo. *See Spectra-4, LLP v. Uniwest Commer. Realty, Inc*., 290 Va. 36, 43, 772 S.E.2d 290, 293 (2015) ("[W]e review de novo the purely legal issues of what the terms of a contract are, and how those terms apply to the facts of the case.").

For this claim, CGI seeks recovery of the expenses it incurred in helping FCi win the prime contract and to disgorge FCi of any profits it realized from performing work promised to CGI. The teaming agreements plainly governed the parties' relationship in preparing a contract proposal for the State Department. These agreements required the parties to bear their own costs of performance and precluded them from recovering lost profits for a breach. In light of these provisions, CGI does not dispute the amended teaming agreement is an express contract covering

13

the subject matter of the parties' dispute, including the kind of damages it seeks to recover in equity.

CGI offers two reasons for why this agreement should not bar its unjust enrichment claim. First, CGI contends an express contract procured by fraud cannot be used by FCi to shield itself from liability. Second, CGI contends the express contract is unenforceable because of a lack of mutuality between the parties. Because the post-award provisions are not enforceable against FCi and these provisions are the only consideration it received for entering the contract, the entire agreement fails. We reject both of CGI's contentions.

Although the jury found the amended teaming agreement was procured by FCi's fraud and the circuit court did not disturb this finding, under the circumstances of this case, CGI may not pursue an equitable claim for unjust enrichment. We have long held that a contract procured by fraud is voidable at the option of the injured party. *Wilson v. Hundley*, 96 Va. 96, 100-01, 30 S.E. 492, 494 (1898). A victim of fraudulent inducement may rescind the contract or affirm the contract and sue for damages. *Id.* When a rescission occurs, "the contract is terminated for all purposes, and the parties are restored to the status quo ante." *McLeskey v. Ocean Park Investors, Ltd.*, 242 Va. 51, 54, 405 S.E.2d 846, 847 (1991).

CGI elected to sue for tort and contract damages and as a consequence, "affirme[d] the contract" and "consent[ed] to be bound by its provisions." *Ewig v. Dutrow*, 128 Va. 416, 424, 104 S.E. 791, 793 (1920). Accordingly, the parties' express contract remains in effect. FCi's conduct in procuring this contract does not change the nature of CGI's unjust enrichment claim — an alternative cause of action for breach of contract. CGI may not recover on a quasi-contractual claim that is otherwise precluded by a contract which CGI has affirmed.

14

Further, although the amended teaming agreement created no legally enforceable obligation for FCi to extend a subcontract to CGI, the amended teaming agreement created enforceable, reciprocal obligations governing the parties' relationship during and after the bidding process. *See C.G. Blake Co. v. W.R. Smith & Son*, 147 Va. 960, 971-72, 133 S.E. 685, 688 (1926) ("Mutuality of contract [is] sufficiently complied with when there are promises on each side that something shall be done for the benefit of the other side . . . although they may relate to different terms of the contract."). Specifically, in exchange for CGI's assistance in preparing the proposal, upon any award of a prime contract, CGI bargained for the opportunity to obtain a subcontract from FCi through "good faith" negotiations with FCi. Among other things, any final subcontract also depended on CGI's "best and final proposal to FCi." CGI may have expected a subcontract with the workshare allocation set forth in the amended teaming agreement, but both sides bargained only for the opportunity to negotiate a final subcontract within the framework provided by their agreement. As such, the amended teaming agreement did not fail for a lack of mutuality.

Accordingly, we hold the circuit court did not err in entering summary judgment for FCi on the unjust enrichment claim.

## III. Conclusion

For the foregoing reasons, we affirm the decision of the circuit court.

*Affirmed.*

15