PRESENT: All the Justices

G. NELSON MACKEY, JR.,

v. Record No. 190671

OPINION BY
JUSTICE WILLIAM C. MIMS
May 28, 2020

HARRIOTTE DODSON McDANNALD, EXECUTRIX
OF THE ESTATE OF E. GRIFFITH DODSON, JR., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Humes J. Franklin, Jr., Judge Designate

In this case, we consider as a matter of first impression whether an obstructive act committed before the accrual of a cause of action tolls the statute of limitations under Code § 8.01-229(D).

## I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Nelson Mackey joined the law firm of Dodson, Pence, Viar, Young & Woodrum as a partner in 1987. In 1990, the firm filed a certificate of partnership under the name "Dodson, Pence, Viar, Woodrum, and Mackey" that listed Mackey as a partner. Mackey soon determined that his partners were not "on the same page with" him regarding compensation arrangements and so he left the firm in 1995. In response, the remaining partners—Griffith Dodson, Richard Pence, and Richard Viar—formed the partnership of "Dodson, Pence, & Viar" by filing another certificate of partnership that same year. No formal winding up of the partnership or accounting of partnership assets occurred upon Mackey's departure, nor did he seek any distribution of assets.

A. Trigon Issues Stock

A mutual insurance company, Trigon Health Care, Inc., provided health insurance coverage for the firm before, during, and after Mackey's tenure as a partner. Mackey maintained

a family plan through Trigon during his time with the firm, the premiums for which were paid as a partnership expense from partnership revenue.

In 1997, Trigon demutualized and became a stock insurance company. As part of this restructuring process, Trigon issued 683 shares in the name of Dodson, Pence, Viar, Woodrum, & Mackey even though the partnership purchasing insurance coverage at that time was Dodson, Pence, & Viar. Over the ensuing years, various mergers and a stock split occurred. As a result, the 683 Trigon shares eventually became 1,450 shares in WellPoint, Inc., plus approximately $20,000 cash in merger consideration.

As these corporate developments occurred, Mackey's former partners were aging. Pence passed away in 1999 and Dodson followed in 2001. Their respective daughters, Liza Urzo and Harriette Dodson McDannald, qualified as their estates' representatives.

Shortly before his own death, Viar wrote to National City Bank to inquire regarding "some shares of Trigon stock registered in the name of Dodson, Pence, Viar, Woodrum & Mackey, a law partnership dissolved years ago" that he learned may exist from a recent proxy statement. The bank responded on July 11, 2002, advising him that 683 shares had been issued in that firm's name in 1997 and that the shares were worth approximately $64,000 at the time. Viar apparently took no further action based on this letter before his October 2002 death. His wife, Joyce Viar, qualified as his estate's representative.

B. Mackey Learns of the Stock's Value

While working to close down what remained of the partnership's practice in late 2002, Viar's longtime assistant, Mary Workman, came across documents relating to the Trigon stock. She contacted Mackey, who traveled to the office to pick up copies of the documents including Viar's letters with National City Bank. A few weeks later, Mackey called Workman to ask if she

had access to his former partners' death certificates. She did not, and Mackey did not attempt to contact the executors of his former partners' estates regarding the certificates or to let them know about the stock. During this same period, Mackey changed the mailing address for Dodson, Pence, Viar, Woodrum & Mackey to his residential address.

Following Viar's death, his former associate, Michael Quinn, helped Mrs. Viar with various tax matters relating to her late husband's estate. In doing so, Quinn came across Viar's 2002 letter to National City Bank regarding the Trigon stock. He did not, however, find the letter from the bank to Viar confirming the value of the stock and so did not know how much it was worth at the time. Quinn reached out to Mackey to let him know he was helping Mrs. Viar, and they discussed the stock "on a couple of occasions" over the following months.

In October 2003, Mackey sent Quinn a one-line email stating: "The Replacement Fee for Lost Share Certificate(s) is $2.07 per share, which for 683 shares is $1,413.81." Despite knowing the approximate value of the stock at the time, Mackey did not share that information with Quinn. During an in-person encounter in late 2003, Quinn again asked about the stock. Mackey told him: "I have looked into it. There is not enough money involved." Quinn understood this remark—which Mackey later denied making—as meaning that "the stock had no value, and should really have been of no financial interest to Mrs. Viar."

Quinn relayed Mackey's statements to Mrs. Viar, telling her that Mackey said "there wasn't enough there to bother with." Based on these statements, the Viar estate made no efforts to collect the stock. Quinn acknowledged that he had enough information to look into the stock value himself, but he did not because "[he] trusted Mr. Mackey" and believed Mackey was trying to help a widow of a former partner just like he was. Quinn did not contact the Dodson or

3

Pence estates regarding the stock or Mackey's statements, although he later acknowledged that had he known the value of the stock at the time, he would have informed the other estates.

C. Mackey Sells the Stock

Years later in 2009, Mackey wrote to Computershare—the contractor WellPoint, Inc., employed to administer its securities transactions—directing it to sell the stock. He drafted the letter on "Dodson, Pence, Viar, Woodrum & Mackey" letterhead he created that included his home address, phone number, and personal email address. He directed Computershare to "remit the merger consideration and net sales proceeds payable to Dodson Pence Viar Woodrum Mackey, G. Nelson Mackey, Jr.," to his home address. Computershare complied and sent Mackey two checks—one for $20,513.49 for the merger consideration and another for $77,995.90 from the stock sale. Mackey deposited the checks into a business account he and his wife controlled. Mackey did not inform any of the estates of the sale even though he "understood [the stock] was a partnership asset" that he "assume[d]" his "deceased law partners would have an ownership interest in."

While reviewing old files in 2015, Quinn came across the July 2002 letter from National City Bank to Viar explaining the Trigon stock had been worth approximately $64,000 at the time. After reviewing the letter, Quinn notified Mrs. Viar and attempted to contact Mackey to no avail. Quinn eventually contacted Computershare, which said that it could not release information unless he proved he represented someone entitled to the stock. Nevertheless, Computershare advised him that there had been "some activity in the account" and suggested Quinn contact Mackey—something Quinn found "very suspicious." After Quinn provided documentation, Computershare confirmed that Mackey had liquidated the stock in 2009. Quinn

4

reported his findings to Mrs. Viar and contacted the other estates. The Pence and Dodson estates thus learned of the stock's existence and Mackey's actions for the first time in November 2015.

D. Litigation Ensues

On December 22, 2015, the executors of the three estates sued Mackey alleging, among other things, conversion of the stock. Mackey filed a plea in bar of the statute of limitations. The trial court determined that the limitations issue should be decided at trial. The case was tried without a jury on August 21, 2017. At the close of evidence, Mackey moved to strike arguing that no tolling occurred because the misrepresentation, if any, was made long before any act creating a cause of action occurred. The trial court asked the parties to brief the limitations issue in written closing statements.

The trial court ultimately issued a letter opinion ruling that Mackey converted the stock. It first found that Code § 8.01-229(D) tolls the limitations period even if no cause of action has accrued at the time of the misrepresentation, relying on the analysis in *Evans v. Trinity*, 137 F. Supp. 3d 877 (E.D. Va. 2015), for this proposition. It further found that Mackey "made an affirmative act to conceal his planned conversion of the Trigon stock from each of its rightful owners," which "resulted in the conversion being hidden from the plaintiffs until 2015." The trial court recited the evidence regarding the interactions between Mackey and Quinn at length, observing that it did "not find Mackey's testimony to be credible." The trial court noted that Mackey asked Workman for the death certificates, changed the firm's mailing address, and sold the stock all without informing the estates even though Quinn asked about the stocks on multiple occasions. It then wrote:

> These acts and omissions do not rise to the level of affirmative
> misrepresentations, but they cast Mackey as having deliberately
> prevented other parties from accessing the stock. On the other
> hand, Quinn had no personal stake in the stock, followed up

5

numerous times to ask if Mackey had any information or could provide updates on its status, then suddenly stopped. Quinn's representation that he did so because Mackey told him to the stock was essentially worthless is both compelling and persuasive.

I am sympathetic to Mackey's argument that Quinn could have looked up the value of the Trigon stock at any time. However, I am not comfortable finding that an experienced lawyer should question every statement from other experienced lawyers with whom he has an ongoing professional relationship and no reason not to trust.

The trial court concluded that "[g]iven Mackey's misrepresentation, I find it reasonable for Quinn to have relied on that statement in deciding not to act further." By ruling that Mackey concealed the stock from "each of its rightful owners," the trial court found that the tolling applied to all of the estates even though Mackey spoke only to Quinn, who was representing Viar's executor.

The trial court further held that the executors had proven the elements of conversion. It found that the executors, as representatives of the deceased partners' estates, had an actual right to the stock at the time of conversion but Mackey did not because he was not a member of the partnership when Trigon issued the stock in 1997. The trial court ultimately awarded $259,212 in compensatory damages and $100,000 in punitive damages, which it confirmed by final order incorporating the letter opinion.

We awarded Mackey this appeal.

## II. ANALYSIS

Mackey's five assignments of error challenge two aspects of the trial court's decision: its application of Code § 8.01-229(D) to toll the limitations period and its finding that the executors proved the elements of conversion.

A. Code § 8.01-229(D) Tolling and Accrual of Cause of Action

Mackey first argues that Code § 8.01-229(D) does not apply to toll the statute of limitations in this case because—to the extent he committed an obstructive act—it occurred long before any cause of action accrued.

Whether the executors' claims against Mackey are barred by the statute of limitations presents a mixed question of law and fact. *William H. Gordon Associates, Inc. v. Heritage Fellowship*, 291 Va. 122, 136 (2016). We review the trial court's legal determination as to the correct limitations period de novo, but "will uphold the trial court's factual findings in accepting or rejecting the defense unless they are plainly wrong or without credible supporting evidence." *Id.*

Code § 8.01-230 provides that the right of action accrues and the limitations period begins to run "from the date the injury is sustained in the case of . . . damage to property." Conversion claims must "be brought within five years after the cause of action accrues." Code § 8.01-243(B). It is undisputed that Mackey sold the stock in 2009 and executors filed the conversion complaint in 2015. "We strictly enforce statutes of limitations unless there is a clear statutory exception or tolling provision." *William H. Gordon Associates, Inc*, 291 Va. at 137. As such, the executors' claim is barred unless Code § 8.01-229(D) operates to toll the limitations period.

That statute provides:

> When the filing of an action is obstructed by a defendant's (i) filing a petition in bankruptcy or filing a petition for an extension or arrangement under the United States Bankruptcy Act or (ii) *using any other direct or indirect means to obstruct the filing of an action*, then the time that such obstruction has continued shall not be counted as any part of the period within which the action must be brought.

7

(Emphasis added.) Code § 8.01-229(D) does not expressly state whether the cause of action

must have accrued at the time of obstruction. Mackey argues that the Court's analysis ends with

the statutory text because "[i]t is axiomatic that the filing of a cause of action cannot be

obstructed where no cause of action exists." He contends that no Virginia cases can be read to

permit tolling prior to accrual of a cause of action and that the trial court erred in relying on the

*Evans* decision holding otherwise.

Although none of our cases have expressly held that an obstructive act prior to accrual

can trigger Code § 8.01-229(D) tolling, that is largely because no cases have presented such

facts.[1] A plaintiff seeking to rely on this tolling provision "must establish that the defendant

undertook an affirmative act designed or intended, directly or indirectly, to obstruct the

plaintiff's right to file [the] action." *Grimes v. Suzukawa*, 262 Va. 330, 332 (2001) (citing

*Culpeper Nat. Bank v. Tidewater Improvement Co.*, 119 Va. 73, 82–84 (1916)). An act that "will

relieve the bar of the statute must be of that character which involves moral turpitude, and must

have the effect of debarring or deterring the plaintiff from his action." *Newman v. Walker*, 270

Va. 291, 298 (2005) (quoting *Culpeper Nat. Bank*, 119 Va. at 83). "Mere silence by the person

liable is not concealment, but there must be some affirmative act or representation designed to

---

[1] The majority of our prior cases addressing Code § 8.01-229(D) tolling have involved a more typical scenario in which a defendant makes affirmative misrepresentations after a cause of action has accrued to prevent the plaintiff from filing the action. *See, e.g.*, *Newman v. Walker*, 270 Va. 291, 294–95, 298 (2005) (holding motorist misrepresenting his name at an accident scene obstructed the plaintiff's filing and tolled the statute). One exception was a case involving the sui generis context of habeas review of a prosecutor's *Brady* disclosure obligations. *Hicks v. Dir., Dept. of Corr.*, 289 Va. 288, 298 (2015). In that case, we recognized tolling where the act of obstruction and injury occurred simultaneously. *Id.* (holding that "in a claim for habeas corpus relief based on a *Brady* violation, the failure to disclose exculpatory evidence qualifies as obstruction by the defendant that prevents the filing of the claim for purposes of Code § 8.01-229(D)" because the failure to disclose is both the "omission or act obstructing the filing" and "the core element of the claim for relief itself, which results in injury to the litigant").

8

prevent, and which does prevent, the discovery of the cause of action." *Culpeper Nat. Bank*, 119

Va. at 83–84 (quoting 2 H.G. Wood & Dewitt C. Moore, Limitation of Actions at Law and in

Equity 1422 (4th ed. 1916)).  The requisite obstruction "must consist of some trick or artifice

preventing inquiry, or calculated to hinder a discovery of the cause of action by the use of

ordinary diligence." *Id.* (quoting 2 Wood & Moore, *supra*, at 1422).  Interpreting a similar

Indiana statute,[2] the United States Supreme Court observed:

> The fraud and deceit which enable the offender to do the wrong
> *may precede its perpetration*.  The length of time is not material,
> provided there is the relation of design and its consummation.
> Concealment by mere silence is not enough.  There must be some
> trick or contrivance intended to exclude suspicion and prevent
> inquiry.

*Wood v. Carpenter*, 101 U.S. 135, 143 (1879) (emphasis added) (quoted with approval in

*Culpeper Nat. Bank*, 119 Va. at 83).

From these authorities, it is apparent that the focus of Code § 8.01-229(D) is the

defendant's intent, not the timing of the obstructive actions.  Thus in *Grimes* this Court held that

the statute did not toll the elapsed limitations period on a plaintiff's battery claim when her

assailant wore a mask because "his use of the mask was intended to conceal his identity and not

to obstruct her filing of an action within the intendment of Code § 8.01-229(D)."  262 Va. at 332.

Similarly, the federal district court in *Evans* held in a products liability case that the

manufacturer's failure to seek regulatory approval of certain changes to guardrail design while

seeking approval for others constituted a misrepresentation sufficient to trigger tolling under the

---

[2] That statute provided, in relevant part:  "The following actions shall be commenced within six years after the cause of action has accrued, and not afterwards. . . .  If any person liable to an action shall conceal the fact from the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action."  *Wood*, 101 U.S. at 138.

statute. 137 F. Supp. 3d at 882–84. Although that court recognized that no Virginia court had addressed whether the statute applies when "the alleged concealment occurred prior to the injury in question and was not directed at obstructing the particular plaintiff's claims," it opined that "to interpret the statute to allow only concealment after an injury would essentially prevent plaintiffs in products liability actions from ever asserting the doctrine of fraudulent concealment to toll the statute of limitations." *Id.* at 883–84.

The *Evans* decision is distinguishable from the case at bar in that it involved a pretrial motion for judgment on the pleadings and was particularized to a products-liability fact pattern involving concealment of design changes from federal regulators. *Id.* at 879–80. Nevertheless, its reasoning evinces sound policy. It would be illogical to interpret Code § 8.01-229(D) in a way that would preclude tolling for acts intended to obstruct the filing of future lawsuits simply because the obstruction occurred before the injury happened. As the *Evans* court recognized, intent—not timing—is the touchstone of the inquiry: "Once the factual record is developed through discovery, the evidence might support the inference that the Defendants' affirmative misrepresentations were made with no expectation or knowledge whatsoever of potential harm to motorists, and for some purely legitimate objective, other than obstructing litigation." *Id.* at 884.

In light of these principles, we hold that Code § 8.01-229(D) tolls the limitations period when a defendant's obstructive acts occur before a cause of action accrues, provided the defendant intended those acts to "prevent[] inquiry, or . . . to hinder a discovery of the cause of action by the use of ordinary diligence." *Culpeper Nat. Bank*, 119 Va. at 84 (quoting 2 Wood & Moore, *supra*, at 1422). If a defendant lacks this obstructive intent, however, there can be no tolling under the statute.

B.  Code § 8.01-229(D)'s Effect in this Case

Mackey contends that he did not intentionally misrepresent represent the stock's value, so the statute should not apply to toll the limitations period.  He further argues that if his conduct did toll the limitations period, it only did so as to the Viar estate because none of his actions or statements were directed toward the Dodson or Pence estates.

Whether the evidence was sufficient to prove that Mackey used "direct or indirect means to obstruct the filing of an action" is a question for the trier of fact, who is "present in the courtroom to observe witnesses' demeanor and hear their testimony as they undergo rigorous cross-examination."  *Dennis v. Commonwealth*, 297 Va. 104, 126 (2019).  For this reason we will defer to the trial court's factual findings and will not set them aside "unless it appears from the evidence that [its] judgment is plainly wrong or without evidence to support it."  *Id.* (quoting Code § 8.01-680).

Ample evidence in the record supports the trial court's conclusion that Mackey's misrepresentation about the stock's value was the reason Quinn and Mrs. Viar did not look into the stock further or contact the other estates.  The trial court found that Quinn was a disinterested party who exhibited a pattern of inquiring about the stock and asking Mackey for updates until Mackey told him "the stock was essentially worthless."  Once that happened, Quinn "suddenly stopped" asking about the stock.  The trial court found that Mackey's testimony, including his denial of the misrepresentation, was not credible, but found Quinn's testimony that he trusted Mackey and relied on his statements "both compelling and persuasive."

Although the trial court acknowledged that Quinn had the necessary information to look up the stock's value at any time, it nevertheless found that Quinn's reliance on Mackey's statement in deciding not to act further was reasonable because both were experienced lawyers

11

who had worked together and had an apparent common goal of assisting the widow of a former colleague. The trial court, properly relying on the principles of professionalism to which all members of the Bar are expected to adhere, found that Quinn had "no reason not to trust" Mackey.

The trial court's conclusions are consistent with our prior characterization of actions that will toll the limitations period. Mackey's misrepresentation that the stock was not worth pursuing when he knew the shares were worth tens of thousands of dollars was an act that "involved moral turpitude" and had "the effect of debarring or deterring" Quinn or Mrs. Viar from looking into the matter further. *Newman*, 270 Va. at 298 (quoting *Culpeper Nat. Bank*, 119 Va. at 83). It thus went beyond "mere silence" and amounted to an "artifice preventing inquiry, or calculated to hinder [the eventual] discovery of the cause of action by the use of ordinary diligence." *Culpeper Nat. Bank*, 119 Va. at 83 (quoting 2 Wood & Moore, *supra*, at 1422).

Mackey's misrepresentation, however, was directed only to Quinn, who represented Mrs. Viar. Our cases interpreting Code § 8.01-229(D) consistently hold that "[m]ere silence by the person liable is not concealment"—instead, "there must be some affirmative act or representation" that is "directly intended to prevent discovery" for the limitations period to be tolled. *Newman*, 270 Va. at 296 (quoting *Culpeper Nat. Bank*, 119 Va. at 83–84). The record establishes that Mackey had no contact with either the Dodson or Pence estates. To the extent that Mackey's misrepresentation to Quinn prevented him from notifying the other estates, that causal chain is too attenuated for this Court to infer this requisite obstructive intent on Mackey's behalf directed against those other estates.

12

Accordingly, the trial court correctly held that Mackey's misrepresentation to Quinn tolled the limitations period as to the Viar estate but erred in extending that tolling to the Dodson and Pence estates.

## C. Sufficiency of Conversion Claim

Mackey's remaining arguments challenge the trial court's conclusion that his actions constituted conversion. Conversion is "any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994) (quoting *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75 (1956)). Although a cause of action for conversion typically applies only to tangible property, this Court has recognized the conversion of intangible property rights that "arise from or are merged with a document, such as a valid stock certificate, promissory note, or bond." *Id.* To establish a conversion of intangibles, however, the plaintiff must have both a property interest in and "be entitled to immediate possession" of the documented intangible property. *Id.* For this reason, this Court has refused to recognize a conversion claim "for interference with *undocumented* intangible property rights." *Id.* at 306. Only "a clear, definite, undisputed, and obvious property right in a thing to which [the plaintiffs] are entitled to immediate possession [is] sufficient to support a claim for conversion." *Id.*

### 1. Mackey's Right to Possess the Stock

Mackey first asserts that he had a right to immediate possession of the stock because Trigon issued the shares in the name of "Dodson, Pence, Viar, Woodrum, & Mackey" and did so based on the firm's insurance payment made at least partially during his tenure at the firm. Because the shares were a partnership asset, Mackey argues, he had an immediate possessory

13

interest in them. This contention is procedurally defaulted because he did not present the argument he makes on appeal to the trial court. Rule 5:25.

The closest Mackey came to raising this argument at trial occurred during his motion to strike when he argued that he would have a right to immediate possession of the stock as a surviving partner of Dodson, Pence, Viar, Woodrum, & Mackey. He mentioned a statute providing that "an asset that is titled in the name of the partnership is a partnership asset" but did not provide a citation. The trial court rejected this argument, ruling that the stock "wasn't an asset of the defunct partnership." Mackey listed as an objection to the final order that the trial court "ignored Virginia partnership law (Virginia Code Section 50-73.90) that provides that property titled in the name of a partnership is presumed to be owned by the partnership and further ignored Mackey's own interest in the stock." This citation, however, is to the Virginia Revised Uniform Partnership Act rather than the applicable Virginia Uniform Partnership Act. He continued citing to the incorrect statute in his petition for appeal. Only in his opening brief did Mackey include the correct statutory language and citation.

The provisions of the applicable Virginia Uniform Partnership Act and the inapplicable Virginia Revised Uniform Partnership Act are materially different. Former Code § 50-8(4), which governed at the time the stock was issued, provided: "A conveyance to a partnership in the partnership name, though without words of inheritance, passes the entire estate of the grantor unless a contrary intent appears." As Mackey acknowledges on brief, this "statute appears to have been intended to address an issue not presented in this case." The inapplicable statute Mackey cited to the trial court provides much more directly: "Property is partnership property if acquired in the name of . . . [t]he partnership." Code § 50-73.90(A)(1). By failing to argue the appropriate governing law, Mackey deprived the trial court of "the opportunity to rule

14

intelligently on the issue." *Scialdone v. Commonwealth*, 279 Va. 422, 437 (2010). Accordingly, Rule 5:25 precludes us from reviewing Mackey's fourth assignment of error.[3]

2. Mrs. Viar's Right to Possess the Stock

Mackey next argues that the executors lacked a current possessory interest in the stock. The trial court concluded that the executors had proven their conversion claim, citing Code § 64.2-529 and ruling: "At the time Mackey converted the stock to his possession, the estates of his former partners had actual rights to that stock. . . . As representatives of these estates, the plaintiffs have a duty to resolve the estates' outstanding debts and assets." Although the claims of the Dodson and Pence executors are time-barred, the trial court's conclusion was correct with respect to Mrs. Viar.

The stock constituted documented intangible property because it was evidenced by stock certificates and other documentation. It was distributed to a partnership in which only Dodson, Pence, and Viar were partners. Because each of the partners are deceased, there is no surviving

---

[3] Regardless of this procedural default, Mackey's argument is unavailing. The partnership law applicable at the time indicates that Dodson, Pence, Viar, Woodrum & Mackey could not have received the stock regardless of the name in which it was issued. Under the Virginia Uniform Partnership Act, the withdrawal of any partner from a partnership triggered dissolution. *See* Code § 50-29 (1995) ("The dissolution of a partnership is the change in relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."). Upon dissolution, the partners had two options. The remaining partners could either carry on with business as a new partnership or the partnership could terminate. *See* Code §§ 50-37, 50-37.1, 50-38, 50-41, 50-42 (1995). The options were mutually exclusive. If the partners elected to terminate the partnership, their authority to act for the partnership ended except insofar as necessary to wind up the business. If, however, the remaining partners elected to carry on as a new partnership, winding up would not occur. Instead, the business would continue as it had before, and the departing partner would be entitled to an accounting and payment of his or her share of the partnership interest.

The record in this case establishes that Mackey's former partners elected to carry on as a new partnership. Mackey therefore could not have had a continuing interest in the dissolved firm with which to assert ownership of the stock. Accordingly, the trial court did not err in concluding that Mackey had no right to possess the stock and that he wrongfully asserted control over it.

15

partner to hold the assets in trust pending a determination of the partnership's debts and liabilities. *See Hoover v. Bowers*, 146 Va. 84, 88 (1926). Viar's interest in the stock proceeds is readily ascertainable. Upon Viar's death, his executor had a duty to resolve the estate's outstanding debts and assets. Mrs. Viar, as Viar's executor, is thus entitled to immediate possession of the stock proceeds to complete her duties in that capacity. By wrongfully exercising dominion over the stock proceeds and depriving Mrs. Viar of their possession, Mackey committed conversion. Accordingly, the trial court did not err in finding that Mrs. Viar was entitled to immediate possession of the stock and that Mackey converted it.

## III. CONCLUSION

Code § 8.01-229(D) operates to toll the limitations period whenever a defendant commits an obstructive act with the intent to obstruct a future plaintiff's filing of an action, regardless of whether the cause of action has accrued at the time of the obstructive act. Under this standard, Mackey's misrepresentation to Quinn was sufficient to toll the statute of limitations as to Mrs. Viar until Quinn learned of the stock's value in 2015. Because Mackey demonstrated no obstructive intent as to the Dodson or Pence estates, however, Code § 8.01-229(D) does not toll the limitations period for their claims. Mackey converted the stock because he lacked a right to possess the stock while Mrs. Viar had an immediate right to possession to carry out her administrative duties as executor of Viar's estate.

For these reasons, we affirm the trial court's rulings as to Mrs. Viar, reverse as to the other executors, and remand for further proceedings consistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

16