COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Ortiz and Friedman
Argued at Fredericksburg, Virginia

SOLARIA CORPORATION, ET AL.

v.      Record No. 1178-24-4

SIEMENS GOVERNMENT
 TECHNOLOGIES, INC., ET AL.

MEMORANDUM OPINION* BY
JUDGE MARY GRACE O'BRIEN
SEPTEMBER 23, 2025

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard,[1] Judge

Katherine D. Cappaert (John M. Caracappa; Joseph F. Ecker;
Heather P. Hildreth; Steptoe LLP, on briefs), for appellants.

Robert A. Angle (Bonnie S. Gill; Lauren H. Miller; Ralph A. Finizio;
Troutman Pepper Locke LLP, on brief), for appellees.

Solaria Corporation and SolarCA, LLC (collectively, "Solaria") appeal a judgment in favor

of Siemens Government Technologies, Inc. and Siemens Industry, Inc. (collectively, "Siemens") on

claims for damages resulting from Solaria's underperforming solar panel modules. The court found

that a design defect caused the modules to generate less than the warranted power levels.

Solaria argues the court erred by ruling that Siemens's Terms and Conditions ("T&Cs")

governed the contractual agreement between the parties, that Siemens's claims were covered by

both indemnification and warranty provisions in the T&Cs, and that Solaria breached these

provisions. Solaria further argues the court erred in ruling that it breached a requirement in the

T&Cs to provide replacement modules.

_____

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The Honorable David Bernhard presided over the proceedings below. Now a member of
this Court, Judge Bernhard took no part in this decision.

Solaria also challenges the court's exclusion of its expert's opinion concerning wind speeds to which the solar panels were exposed at certain times. Finally, Solaria contends the court erred by awarding Siemens the entirety of its claimed damages. For the following reasons, we affirm.

BACKGROUND

I. The Project

In 2012, Solaria sold Siemens a solar module system for installation at the U.S. Army's White Sands Missile Range in the New Mexico desert. The system included 15,480 solar modules mounted on 774 "trackers" (20 modules per tracker) that rotated to orient the modules toward the sun. The module system converted sunlight to electricity.

Solaria's modules employed a novel and unique technology to concentrate sunlight. The design relied on less silicon than conventional modules; because silicon was an expensive component, this design reduced manufacturing costs and prices. Solaria supplied the modules and trackers, but another subcontractor installed the equipment, and Siemens was responsible for operation and maintenance.

II. Performance Guarantees

Siemens purchased Solaria's solar module system to fulfill obligations Siemens owed to the U.S. Army under an energy savings performance contract ("ESPC").[2] In the ESPC, Siemens guaranteed to the U.S. Army a specified power output for 25 years. This guarantee was based on module specifications[3] Solaria had provided to Siemens, and which Siemens had included in its

---

[2] The ESPC was executed pursuant to 42 U.S.C. § 8287. That statute provides that a federal agency can "enter into contracts . . . solely for the purpose of achieving energy savings and benefits ancillary to that purpose." 42 U.S.C. § 8287(a)(1). Under such contracts, a contractor—like Siemens here—incurs the up-front cost of "implementing energy savings measures" and, in exchange, is entitled to "a share of any energy savings directly resulting from implementation of such measures during the term of the contract." *Id.*

[3] Solaria refers to these product specifications as a "data sheet."

proposal to the U.S. Army. According to its specifications, Solaria warranted that its solar panel modules would generate no less than 90% of their specified wattage for 12 years and no less than 80% for 13 years thereafter. Solaria knew that Siemens's 25-year performance warranty to the U.S. Army was based on Solaria's corresponding 25-year guarantee in the module specifications.

The module specifications also provided Solaria's "5 [y]ear workmanship" warranty. Additional specifications for Solaria's entire tracking system reflected that the modules were designed to withstand 3-second wind gusts of up to 90 mph.

In the ESPC, Siemens agreed to make shortfall payments to the U.S. Army if the modules underperformed.

### III. Contract Formation

Siemens and Solaria negotiated the T&Cs, exchanging redlines of proposed terms.[4] Solaria attached the final version of the negotiated T&Cs to the quote it provided to Siemens ("Quote"). Solaria's Quote also referred to and attached a limited product warranty ("Limited Warranty").

Siemens then issued a Purchase Order, which referenced the Quote as follows: "This Purchase Order is placed in accordance with attached Solaria Quote #00007730." The Purchase Order also specifically referenced the T&Cs: "This Purchase Order is subject to the attached Terms and Conditions."

### IV. Indemnity and Warranty Obligations

Section 8 ("Indemnification") of the T&Cs required Solaria to indemnify Siemens against "any and all" claims and liabilities arising from "any defect":

> **8. Indemnification:** Seller [i.e., Solaria] agrees to indemnify and hold harmless Buyer [i.e., Siemens], its directors, officers, employees and agents, from and against *any and all* claims or liability (other than liability solely due to the negligence of Buyer), including reasonable attorneys' fees, arising out of or resulting in any way from

---

[4] For example, Solaria removed a paragraph called "Additional Warranties" and edited the "Limitation of Liability" paragraph to apply to both parties, not just Siemens.

*any defect* in the Items provided hereunder or from any act or omission of Seller, its agents, employees, or subcontractors . . . .

(Bold in original; other emphases added).

Section 7 ("Warranties") of the T&Cs provided Solaria's product warranties as follows:

> **7. Warranties: a. Products.** Seller [i.e., Solaria] represents and warrants (i) that the products fully conform to Seller's specifications and descriptions *contained in the PO* [i.e., Siemens's Purchase Order] and *any attachment thereto*, and (ii) that the products shall be merchantable and free from *defects in workmanship and material* . . . .

(Bold in original; other emphases added).

Throughout this litigation, Solaria has argued that its Limited Warranty was incorporated by reference into Section 7 of the T&Cs. The Limited Warranty reiterated the 25-year performance guarantee and the 5-year workmanship warranty set forth in Solaria's product specifications:

> (a) Solaria warrants that for a period of 5 years from the date of shipment, the Products will be free from defects in material and workmanship, under normal conditions and when used in accordance with its documentation. If during the warranty period, a defect is confirmed[,] . . . Solaria will, at its sole obligation and Customer's exclusive remedy, repair or replace the warranted Product . . . .
>
> (b) Solaria warrants that for a period of 12 years from the date of shipment, the power output of the Product will not fall below 90%, and for a period of 25 years from the date of shipment, the power output of the Product will not fall below 80%.

The Limited Warranty also contained exclusions stating that the Limited Warranty "shall not apply to products that"

> (a) are not used for their intended purpose in accordance with their documentation; [or]
>
> (b) have been subject to abuse, misuse, neglect, or accident, including environmental damage and natural or man-made disasters . . . .

- 4 -

The Limited Warranty contained the following disclaimer:

> EXCEPT AS EXPRESSLY WARRANTED IN THIS LIMITED
> PRODUCT WARRANTY, THE PRODUCT IS PROVIDED "AS
> IS," AND CUSTOMER'S USE THEREOF IS AT ITS OWN RISK.
> SOLARIA DOES NOT MAKE, AND HEREBY DISCLAIMS,
> ANY AND ALL OTHER WARRANTIES, WHETHER EXPRESS,
> IMPLIED, STATUTORY OR OTHERWISE, INCLUDING
> WITHOUT LIMITATION THE IMPLIED WARRANTIES OF
> MERCHANTABILITY, FITNESS FOR A PARTICULAR
> PURPOSE, AND NONINFRINGEMENT, AND ANY
> WARRANTIES ARISING FROM A COURSE OF DEALING,
> USAGE, OR TRADE PRACTICE.  SOLARIA DOES NOT
> WARRANT THAT THE PRODUCTS WILL OPERATE
> WITHOUT INTERRUPTION OR WILL BE DEFECT-FREE, OR
> THAT THE PRODUCTS WILL MEET CUSTOMER'S
> REQUIREMENTS.

The Limited Warranty also purported to limit Siemens's remedies, stating that the "remedies in this Limited Product Warranty are Customer's sole and exclusive remedies and are in lieu of all other remedies at law or in equity, notwithstanding any failure of essential purpose."

## V.  Solar Module Underperformance

Solaria provided the module system, and Siemens paid in full at a price of approximately $7.7 million.  Installation was completed in December 2012, and Siemens began performance measurement and verification in 2013.

Five years into the contract, the power output fell below the level that Siemens guaranteed to the U.S. Army, and Siemens was required under the ESPC to make shortfall payments.  Siemens began investigating the extent and cause of the reduced performance.  In August 2018, Siemens provided 25 modules to Solaria for testing; 88% of those tested generated less than their warranted power level.  In March 2020, Siemens contracted with a third party to test an additional 60 modules; 60% were generating less than their warranted power level.

The module performance continued to degrade every year, and Siemens was required to continue making shortfall payments to the U.S. Army.

In May 2020, Siemens made a formal warranty claim to Solaria. Siemens's letter to Solaria referenced the Limited Warranty and advised that the modules were "not providing 90% power output" as warranted. Solaria did not agree to the claim, and in September 2020, Siemens wrote another letter, informing Solaria that it would pursue all available remedies. The September 2020 letter provided as follows: "To be clear, Siemens'[s] claim is based on both Solaria's product warranty *and* the remedy provided for in the terms and conditions of its agreement with Siemens."

Siemens determined that the most cost-effective strategy for addressing the underperformance was to replace all modules. Solaria stopped manufacturing the modules it had sold to Siemens and did not provide a source of comparable replacements, as required by Section 12 of the T&Cs. Siemens's warranty claim went unresolved for over a year.

## VI. Litigation

In July 2021, Siemens brought a five-count complaint against Solaria: (1) breach of express warranties contained in Section 7 of the T&Cs; (2) breach of express warranties under Code § 8.2-313; (3) breach of implied warranties under Code §§ 8.2-314 and -315; (4) breach of contract for failure to provide replacement modules under Section 12 of the T&Cs; and (5) indemnification under Section 8 of the T&Cs.

Following a nine-day bench trial and post-trial briefing, the court issued an order with factual findings and conclusions of law. It found that the parties' contract consisted of Solaria's Quote, Siemens's Purchase Order, and the negotiated T&Cs. However, the court found that the Limited Warranty was not part of the contract and therefore its exclusions and disclaimers did not apply.

The court accepted the opinion of Siemens's expert, Dr. John Wohlgemuth, that a design defect caused the modules to underperform. The court concluded that this design defect triggered

Solaria's indemnity obligations under Section 8 of the T&Cs and therefore Solaria was liable for all Siemens's claimed damages, including reasonable attorney fees.[5]

The court awarded Siemens compensatory damages of $6,844,270.94, and after additional briefing and a hearing, attorney fees and costs of $2,007,024.63.[6]

ANALYSIS

I.  Breach of Warranty and Indemnification Obligations

A.  Exclusion of the Limited Warranty

Solaria argues the court improperly excluded the Limited Warranty from the parties' contract and instead held that Siemens's claims were covered by both the indemnification and warranty provisions in the T&Cs.  According to Solaria, the Limited Warranty was part of the contract because (1) the T&Cs incorporated it by reference and (2) the parties conducted themselves as if it applied.  Solaria contends that in excluding the Limited Warranty, the court erroneously "never considered its exclusions and disclaimers."

As to its first argument, Solaria relies on Section 7 ("Warranties") in the T&Cs as incorporating the Limited Warranty by reference.  Section 7 provided that the modules "fully conform to [Solaria's] specifications and descriptions *contained in the* [*Purchase Order*] and *any attachment* thereto."  (Emphases added).  Solaria contends that the Limited Warranty was, in fact, "contained in the [Purchase Order] and any attachment thereto" due to a series of cross-references:

---

[5] The court ruled in Siemens's favor on the other four counts as well.  But because we affirm the full damage award under the indemnification count, we do not address Solaria's assignments of error concerning these other counts.  *See Theologis v. Weiler*, 76 Va. App. 596, 603 (2023) (noting that "'to decide cases on the best and narrowest grounds available,'" appellate courts "look for the best and *fewest* grounds on which to resolve [an] appeal" (quoting *Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022))).

[6] The record does not contain a transcript from the hearing on attorney fees and costs.

specifically, the Purchase Order referenced the Quote, which in turn referenced—and attached—the Limited Warranty.

For its second argument, Solaria relies on evidence that the parties repeatedly consulted the Limited Warranty in disputes about the performance of the solar modules. For example, the parties referred to the document when disputing responsibility for damage following a 2012 wind event. Subsequently, in 2020, Siemens raised a formal warranty claim pursuant to a process outlined in the Limited Warranty and sent a letter expressly stating that "Solaria provided a limited product warranty that applies to these installed modules."

We hold that, considering the plain meaning of the T&Cs, the court did not err in excluding the Limited Warranty. The T&Cs did not incorporate the Limited Warranty by reference and, in fact, expressly rejected any additional terms from Solaria.

An appellate court "review[s] issues of contract interpretation de novo." *Bailey v. Loudoun Cnty. Sheriff's Off.*, 288 Va. 159, 169 (2014). "Basic contract interpretation principles dictate that '[w]hen the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning.'" *Orthopaedic & Spine Ctr. v. Muller Martini Mfg. Corp.*, 61 Va. App. 482, 490 (2013) (alteration in original) (quoting *Env't Staffing Acquisition Corp. v. B&R Constr. Mgmt.*, 283 Va. 787, 793 (2012)). "[C]ourts, when interpreting a contract, 'construe it as written' and do 'not add terms the parties themselves did not include.'" *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 283 Va. 624, 636 (2012) (quoting *Landmark HHH, LLC v. Gi Hwa Park*, 277 Va. 50, 57 (2009)).

The only purported mention of the Limited Warranty was in Section 7 of the T&Cs, which referred to information "contained in the [Purchase Order] and any attachment thereto." But the Limited Warranty was not an attachment to the Purchase Order; it was an attachment to an attachment to the Purchase Order: it was an attachment to Solaria's Quote. Construing Section 7 to incorporate broadly not just an attachment but an attachment to an attachment distorts the plain

- 8 -

meaning of the contract language and conflicts with other provisions in the T&Cs. Courts do not read contract terms in isolation. *See TM Delmarva Power, LLC v. NCP of Va., LLC*, 263 Va. 116, 119 (2002) (stating that "contracts must be considered as a whole 'without giving emphasis to isolated terms'" (quoting *Am. Spirit Ins. Co. v. Owens*, 261 Va. 270, 275 (2001))).

Specifically, Solaria's interpretation of Section 7 conflicts with Section 1 ("Acceptance") of the T&Cs. Section 1 limited Solaria's acceptance of the contract to the terms of the T&Cs and provided that any additional terms from Solaria were rejected:

> **Acceptance:** Acceptance by [Solaria] of a Purchase Order ("PO") from [Siemens] constitutes [Solaria's] acceptance of all terms and conditions contained on the face of the PO as well as all the terms and conditions contained herein (collectively, "Terms and Conditions"). *Additional terms and conditions on any [Solaria] form are objected to and rejected and are of no effect*, irrespective of whether [Siemens] accepted or paid for [Solaria's] items or services. Performance by [Solaria] shall be deemed acceptance of [Siemens's] PO as well as its acceptance of the Terms and Conditions.

(Bold in original; other emphasis added). Thus, pursuant to Section 1, by accepting the Purchase Order, Solaria agreed that the T&Cs were binding and that any other terms or conditions on any Solaria form document—which would include the Limited Warranty—were rejected and of no effect. *See* Code § 8.2-207(2) (precluding additional terms from sales contract where an offer "expressly limits acceptance to the terms of the offer," or the additional terms "materially alter" the contract, or "notification of objection to them has already been given"). Section 7 cannot be construed to incorporate by reference a document that Section 1 rejected.

Siemens's course of performance—including communications with Solaria referencing the Limited Warranty—does not affect our contract interpretation. Siemens could not modify the T&Cs—and graft the previously-rejected Limited Warranty into the contract—by its conduct. *See* Code § 8.1A-303(a) (defining "course of performance" as the "sequence of conduct between the parties to a particular transaction"); Code § 8.1A-303(e)(1) (providing that "express terms [of an

agreement] prevail over course of performance"). Section 19 of the T&Cs ("Amendment or Modification") only authorized contract modification by a "written instrument signed by an authorized representative of both parties." Further, Section 19 reiterated that the T&Cs controlled and that "[e]ach shipment received by [Siemens] shall be deemed to be received only upon the Terms and Conditions, notwithstanding any terms and conditions contained in any order (except the PO), acknowledgment, invoice, or other writing received from [Solaria]." An integration clause in Section 23(g) of the T&Cs underscored that "[t]he PO, as supplemented by the Terms and Conditions, constitutes the entire agreement between the parties relating to the purchase of the Items, regardless of any inconsistent or additional terms in any other document, and supersedes all previous understandings, negotiations, and proposals."

These provisions in the T&Cs—acceptance, amendment or modification, and integration—preclude Solaria's broad construction of Section 7 as incorporating the Limited Warranty by reference. Instead, these provisions make clear that Siemens rejected the additional terms in the Limited Warranty and never modified the T&Cs to include them.

Solaria faults the court for excluding the Limited Warranty yet finding that an "extrinsic" document—Solaria's product specifications—established the solar module performance guarantee. Both documents provided the same information about Solaria's performance guarantee, but the court found that the specifications constituted an express warranty under Code § 8.2-313, a provision within Virginia's Uniform Commercial Code ("UCC"). Solaria contends that the Limited Warranty was the more immediate, and therefore more appropriate, source of any express warranty because it was among the parties' "package of documents" exchanged during contracting. But under the UCC, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Code § 8.2-313(1)(A). An affirmation of fact creating an

- 10 -

express warranty need not be within the four corners of the parties' contract. *See Daughtrey v. Ashe*, 243 Va. 73, 78 (1992) (holding that a jeweler's description of diamond quality in an appraisal form constituted an express warranty). The court did not err in finding that the specifications established Solaria's performance guarantee.

Finally, even assuming the Limited Warranty were part of the contract, the T&Cs would still control. Section 23(i) expressly provided that the T&Cs take precedence. Section 23(i) stated as follows:

> **Order of Precedence.** In the event of any inconsistency or conflict between any terms of this PO, the inconsistency or conflict shall be resolved by giving precedence to the documents in the following order:
> 1) Purchase Order;
> 2) Purchase Order Terms and Conditions;
> 3) Program-Specific Addendum to a Subcontract Agreement, if any;
> 4) Subcontract Agreement between Buyer and Seller;
> 5) Other referenced documents.

(Bold in original). This order-of-precedence clause resolved any inconsistency among terms. *See Hensel Phelps Constr. Co. v. United States*, 886 F.2d 1296, 1299 (Fed. Cir. 1989) ("Contractors should, as a general rule, be entitled to rely on the order of precedence clause and not be required to seek clarification of a putative inconsistency . . . . The order of precedence clause itself resolves that inconsistency."). The Limited Warranty was, at best, an "[o]ther referenced document[]." Therefore, even if the Limited Warranty were not outright rejected under Sections 1 and 23(g), Section 23(i) relegated it to fifth in order of precedence. As such, its disclaimers and exclusions did not negate the indemnity and warranty provisions in the T&Cs.

Solaria actively engaged in a process to negotiate the terms of the T&Cs, editing provisions and exchanging redlines. During negotiations, Solaria never ensured that the T&Cs specifically referenced or incorporated the Limited Warranty. There is no basis for the exclusions and disclaimers in the Limited Warranty to trump any provisions in the T&Cs.

- 11 -

For these reasons, the court did not err in excluding the Limited Warranty and refusing to consider its exclusions and disclaimers.

## B. Design Defect

Solaria argues the court erred in finding that its modules had a design defect that triggered any indemnification or warranty obligation.

The court found it "clear from the testimony of Dr. Wohlgemuth" that "Solaria created a product prone to solder bond failure" and "[t]he defect in the modules triggered Solaria's obligation to indemnify Siemens under Section 8 of the T&Cs against any and all claims or liability resulting from the defect." Solaria contends that Dr. Wohlgemuth's expert opinion about the design defect "should have been deemed unreliable and given no weight by the [court]."

"[I]t is well established that the trier of fact ascertains [an expert] witness'[s] credibility, determines the weight to be given their testimony, and has the discretion to accept or reject any of the witness'[s] testimony." *O'Rourke v. Vuturo*, 49 Va. App. 139, 150 (2006) (second alteration in original) (quoting *Piatt v. Piatt*, 27 Va. App. 426, 435 (1998)). "We defer to the trial [court]'s evaluation of the credibility of the witnesses." *Id.* (quoting *Shackelford v. Shackelford*, 39 Va. App. 201, 208 (2002)). "Where experts offer conflicting testimony, it is within the discretion of the trial court to select either opinion." *Rowe v. Rowe*, 24 Va. App. 123, 140 (1997). A court's resolution of conflicting testimony will only be reversed if plainly wrong. *Shackelford*, 39 Va. App. at 208.

The court did not err in accepting Dr. Wohlgemuth's expert opinion and finding that the modules were defectively designed. Dr. Wohlgemuth, who qualified as an expert in the fields of "[solar] module design, reliability, [industry] standards, and performance," analyzed years of module performance and testing data. He concluded that the modules' design resulted in the failure of internal solder bonds, which in turn resulted in reduced power output. In reaching this

conclusion, Dr. Wohlgemuth analyzed and excluded other possible causes of underperformance, such as weather, improper installation, or neglect.

The solder-bond-failure explanation rested on the facts that the modules contained (1) lenses that concentrated light and heat on the internal solder bonds, and (2) fewer solder bonds per cell than in a conventional solar module. Dr. Wohlgemuth explained that these factors combined to overstrain the solder bonds, which made them susceptible to failure. The strain was exacerbated by the project's desert setting, which exposed the modules to repeated temperature changes known as "thermal cycling." According to Dr. Wohlgemuth, module performance degraded significantly during summer months—suggesting that high temperatures caused widespread solder bond failure. Dr. Wohlgemuth acknowledged that Solaria's modules were less expensive and more "crack tolerant" than conventional modules due to less silicon, but he nevertheless concluded that they were prone to solder bond failure.

The court found that Dr. Wohlgemuth provided "the only consistent explanation" for module underperformance "over the time horizon covered by the evidence presented." Nothing in the record suggests the court's credibility determination was wrong, and the evidence supports the court's conclusion that a design defect caused the modules to produce less power than warranted. *See O'Rourke*, 49 Va. App. at 150.

Nevertheless, Solaria insists that Dr. Wohlgemuth's expert testimony was speculative because it was based on an unrepresentative sample of modules and did not adequately consider variables of abuse, neglect, or weather. But the court considered this challenge to the expert's credibility and rejected it, finding instead that Dr. Wohlgemuth's explanation was based on both an accurate understanding of the relevant facts and a reasonable probability of why Solaria's technology was underperforming. We defer to the court's discretion in accepting the expert's opinion. *See id.* Further, we uphold the court's factual findings about product defect and causation

- 13 -

because they are not plainly wrong. *See William H. Gordon Assocs. v. Heritage Fellowship*, 291 Va. 122, 141 (2016) ("Causation is a factual issue, so we uphold the circuit court's decision unless plainly wrong or without supporting evidence.").

It was also within the court's discretion to credit Dr. Wohlgemuth's explanation over the testimony from Solaria's expert, Eric Daniels. *See Rowe*, 24 Va. App. at 140. Daniels qualified as an expert in "design, installation, operation, maintenance, and performance of solar arrays and in the diagnosis of solar arrays and solar modules, including damage assessment under warranty claims." The court found that, in contrast to Dr. Wohlgemuth's scientifically probable explanation for module underperformance, Daniels testified only about what "possibly" occurred. Daniels "did not put forth an integrated theory of failure for the solar modules, but rather advanced potential explanations for individual observations that did not in linear fashion account for the steady degradation of module performance." We defer to the court's credibility evaluation and decision to accept Dr. Wohlgemuth's expert opinion. *See id.*; *see also O'Rourke*, 49 Va. App. at 150.

In a separate assignment of error, Solaria argues the court erred in precluding Daniels's testimony that wind speeds at the array exceeded 90 mph during storms in 2012 and 2019. Solaria sought to admit Daniels's windspeed opinion to (1) refute Dr. Wohlgemuth's testimony about the design defect causing underperformance and (2) demonstrate that the modules were exposed to winds above the warranty limit. The court ultimately determined that Daniels lacked knowledge and experience to opine on whether the wind speeds ever exceeded 90 mph.

The court did not abuse its discretion in excluding this testimony. Daniels himself testified that he was unable to say whether the wind actually exceeded 90 mph, and on-site weather data recorded the highest gust at 86 mph. Instead, Solaria wanted Daniels to speculate that, regardless of the measured data, the winds must have been greater than 90 mph given the damage that occurred during the 2012 and 2019 windstorms. Daniels not only lacked foundation for his testimony, but it

also would have been speculative to reconstruct windspeeds—especially speeds that had already been measured at a lower rate. Based on this record, we will not disturb the court's evidentiary decision to exclude Daniels's testimony on historic windspeeds.

Therefore, the court did not err in finding that Solaria supplied defectively designed modules and that this defect caused the modules to perform below their warranted level.

## II. Damages

Solaria argues that the court erred in allowing Siemens to recover the entirety of its claimed damages because (i) Siemens did not demonstrate that module underperformance was the sole cause of the shortfall in energy production; (ii) Siemens's damages were not sufficiently foreseeable; and (iii) only 74% of the modules had failed as of the time of litigation. We disagree with Solaria's arguments and affirm the damage award under Section 8 of the T&Cs.

Like all contracts, an indemnity agreement is subject to de novo review and must be interpreted according to its plain meaning. *See Seaboard Air Line R. Co. v. Richmond-Petersburg Turnpike Auth.*, 202 Va. 1029, 1033 (1961) (applying the plain meaning rule to "construing a contract of indemnity and in determining the rights and liabilities of the parties thereunder" (quoting 42 C.J.S. *Indemnity* § 8a (1944))). A "factual finding necessarily implied by [the] award of damages on a breach of contract claim is 'entitled to the same weight as a jury verdict,' and we will not disturb it unless it is 'plainly wrong or without evidence to support [it].'" *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 399 (2012) (second alteration in original) (quoting *Jean Moreau & Assocs. v. Health Ctr. Comm'n*, 283 Va. 128, 142 (2012)).

Section 8 of the T&Cs required Solaria to indemnify Siemens for "any and all claims or liability . . . arising out of or resulting in any way from any defect" in Solaria's modules. Virginia courts have enforced broad indemnity provisions. *See, e.g.*, *Chesapeake & Potomac Tel. Co. v. Sisson & Ryan, Inc.*, 234 Va. 492, 503 (1987) (stating that "parties may contract as they choose so

- 15 -

long as what they agree to is not forbidden by law or against public policy"); *Coady v. Strategic Res., Inc.*, 258 Va. 12, 16-17 (1999) (allowing recovery of attorney fees where the "terms of the indemnification clause are broad and all-encompassing"). Reviewing a similarly broad indemnity agreement, the Supreme Court applied a causation test to determine indemnification liability. *Rappold v. Ind. Lumbermans Mut. Ins. Co.*, 246 Va. 10, 13 (1993) (holding that the phrase "by reason of" had the same effect as "resulting from" and "establish[ed] causation as the test for determining whether a particular loss or expense [was] recoverable").

We hold that Section 8 was broad enough to encompass Siemens's recovery of its claimed damages. The court found that Solaria created a product prone to solder bond failure and therefore was defectively designed and that all of Siemens's damages flowed directly from that defect. The record amply supports these findings.

The evidence isolated the design defect as the sole cause of Siemens's claimed damages. For example, witnesses established that, in reaching its contract with the U.S. Army and setting the performance guarantee, Siemens had considered various environmental and other factors that could lower module output at the White Sands Missile Range—and that Siemens adjusted its guarantee to the U.S. Army accordingly. Further, the record reflects that Siemens adequately maintained the modules and considered other factors prior to seeking remedies from Solaria. Taken together, this evidence was sufficient to establish that the design defect was the sole cause of the shortfalls in energy production.

Additionally, the record supports the court's finding that Siemens's module testing and replacement costs were causally connected to the design defect. The costs to preserve and test the modules were necessitated by the defect, as Siemens had to investigate the origin and extent of the underperformance to pursue a proper remedy. As for the costs to replace all modules, we also find sufficient evidence in the record to support that award. Although Dr. Wohlgemuth opined that

- 16 -

approximately 74% (rather than 100%) of the modules had failed as of the time they were tested, he also testified that all or nearly all would have failed by the end of the 25-year warranty period. Replacing all modules was an appropriate mitigation of Siemens's damages, rather than replacing only a portion of the array and continuing to make necessary shortfall payments to the U.S. Army. *See Forbes v. Rapp*, 269 Va. 374, 380 (2005) (noting the duty to mitigate damages resulting from a breach of contract).

We also affirm that Solaria's indemnity obligation required reimbursing Siemens for its shortfall payments to the U.S. Army. The record supports the court's finding that these shortfall payments flowed from the design defect, and nothing in Section 8 of the T&Cs required that Siemens give Solaria advance notice as a prerequisite to recovery. "[I]t is not the province of the courts to add words to parties' contracts." *Davis v. Holsten*, 270 Va. 389, 397 (2005). Further, to the extent Virginia law imposes a foreseeability requirement, we note that Solaria knew that Siemens based its energy guarantee to the U.S. Army on Solaria's specifications and that Siemens was relying on the modules to perform as warranted. Considering Solaria's knowledge of these circumstances and the breadth of Section 8, we find no error in the court's judgment. [7]

Finally, regarding Solaria's challenge to the quantum of attorney fees awarded, Solaria failed to provide a transcript from the post-trial hearing on that issue and has therefore waived it for appellate review. Rule 5A:8(b)(4)(ii) ("When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered.").

---

[7] Moreover, Solaria cannot avoid responsibility for the shortfall payments by relying on Section 7(d) of the T&Cs, which disclaimed liability for indirect or consequential damages. Section 7(d) applied to warranty claims, not to damages for breach of the indemnity provision in Section 8.

### III. Solaria's Other Claims

Because the court correctly determined that the indemnity provision was broad enough to allow Siemens's recovery of all claimed damages, we need not reach Solaria's assignments of error challenging the viability of the other claims. Judicial restraint obligates us to reach decisions on the best and narrowest grounds available. *See Commonwealth v. White*, 293 Va. 411, 419 (2017); *Theologis v. Weiler*, 76 Va. App. 596, 603 (2023). Thus, we do not address Solaria's contentions that (1) Siemens's implied warranty claims were time-barred under Code § 8.2-725; (2) the evidence failed to show any breach of Section 12 of the T&Cs, which required Solaria to provide replacement modules; or (3) a design defect cannot trigger warranty liability under Section 7 of the T&Cs.

### CONCLUSION

For these reasons, we affirm the court's judgment.

*Affirmed.*